Jamaal **BUTLER**, Plaintiff,

v.

**OAK CREEK–FRANKLIN SCHOOL DISTRICT, Oak Creek High School Athletic Department, Mike Richmond and the Oak Creek Coach's Council, Defendants.**

No. 00–C–1298.

United States District Court, E.D. Wisconsin.

Oct. 13, 2000.

Robert E. Sutton, Milwakee, WI, for Plaintiff.

Charles H. Bohl, M. Elizabeth O'Neill, Whyte Hirschboeck Dudek, SC, Kathy L. Nusslock, Davis & Kuelthau, Milwaukee, WI, for Defendants.

## DECISION AND ORDER

ADELMAN, District Judge.

Plaintiff Jamaal Butler seeks a preliminary injunction pursuant to Fed.R.Civ.P. 65(a) ordering him reinstated to eligibility to participate in high school athletics, including football, for Defendant Oak Creek School District. On August 31, 2000, Butler was suspended from participation in all high school athletics for the entire 2000–2001 school year due to alleged violations of the school's Athletic Code, and this is Butler's senior year of high school.

Butler filed suit in Milwaukee County Circuit Court on September 22, 2000. Defendants were served with process on September 25, and removed the case to federal court on September 27, 2000. (Docket # 1.) This court has jurisdiction pursuant to 28 U.S.C. § 1331. Following a September 29 telephone conference, the parties filed briefs, and oral arguments were held Friday, October 6, 2000.[1]

Defendant is a public school district, and is thus obliged to respect Butler's rights under the United States and Wisconsin constitutions and statutes. Butler contends that there was no lawful authority for him to be subjected to the Oak Creek High School Training Code [hereinafter "the Athletic Code"]; that the way in which he was suspended violated his constitutional right not to be deprived of liberty or property without due process; that his suspension was based upon confidential police records in violation of state law; that various provisions of the Athletic Code are unconstitutional; and finally that

---

1. In addition, Oak Creek School District filed supplemental exhibits on October 10, 2000, from court files at the Oak Creek Municipal Court. (Docket # 24.) These exhibits play no part in this decision.

his suspension violated his rights under the Wisconsin Constitution.

## I. FACTUAL BACKGROUND

Butler is a skilled three-sport athlete; he plays football and basketball, and participates in track and field. He is in his fourth year of high school and is an academic senior. According to John Voorhees, Superintendent of the Oak Creek School District, Butler is expected to graduate at the end of this school year in June 2001. (Voorhees Aff. [docket # 15] ¶ 2.)

### A. Oak Creek High School Athletic Code

Oak Creek High School is a member of the Wisconsin Interscholastic Athletic Association ("WIAA"). (Richmond Aff. [docket # 14] ¶ 4.) This is a voluntary not-for-profit organization operated to organize interscholastic athletic programs that emphasize the total educational process, and to formulate and maintain policies that cultivate high ideals of good citizenship and sportsmanship. (Substitute Exs. in Supp. of Defs.' Br. in Supp. of Mot. for Summary J. [docket # 21] [hereinafter "Defs.' Ex."] Ex. 2 (WIAA Const. Art. II) at 14.) The WIAA Rules of Eligibility require each participating school to have a code of conduct for athletes. These codes of conduct are required to apply to students twelve months per year. The WIAA requires that participating schools' codes of conduct require that student athletes be immediately suspended for at least one game or meet for any violations that (1) occur during the athletic season and that (2) involve the use of alcohol, of tobacco, or the use, possession, purchase, or sale of controlled substances. (Id. (WIAA Rules

of Eligibility, Art. VII §§ 2(A)(1), (2)) at 39.) As part of this requirement, the WIAA Rules of Eligibility note that if a student denies violating the school's code of conduct, the school must provide an opportunity for the student to be heard before the next interscholastic competition. For all other violations—that is, violations that *either* occur during the off-season, *or* that occur during the season, but do not involve alcohol, tobacco, or controlled substances—schools are required to determine their own punishments. (Id. § 2(A)(3)).[2]

According to Superintendent Voorhees's affidavit, the Oak Creek School District enacted the Oak Creek Athletic Code. (Voorhees Aff. ¶ 3.) The Athletic Code is reproduced in the Oak Creek High School student handbook. (Id.; Defs.' Ex. 4 at 39–41.) As required by the WIAA, the current version of the Athletic Code applies to student athletes every day of the year, regardless of whether it is during a student's athletic season or out of season, and regardless of whether school is in session or out of session. (Defs.' Ex. 3 [hereinafter "Athletic Code"] § I(B) (rev. July 1, 2000).)[3] In addition, the rules are in operation continuously, from the first time that they are signed. (Id. § I(C).)

Rule 1 of the Athletic Code requires student athletes to refrain from consuming, selling, buying, distributing, or possessing any amount of alcoholic beverages, controlled substances, and drug paraphernalia. Rule 2 requires student athletes to refrain from using and possessing tobacco products. Rule 3, as pertinent here, requires students to refrain from violating any criminal law or local ordinance, and

**2.** If a school does not enforce its own *eligibility* rules, it is subject to penalties from the WIAA, ranging up to forfeiture of all awards earned by student athletes during or based upon forfeited games or meets, and exclusion from all WIAA tournaments. (Id. Art. I, § 5(a) at 31.) However, it is not clear to me that what the WIAA refers to in one section as a "code of conduct" is the same as a set of rules governing "eligibility," and so it is not clear to me that a school's failure to enforce

its code of conduct would result in these penalties from the WIAA.

**3.** Athletic Director Richmond stated that there have been some changes to the Athletic Code from August 1998 to the present, but that the conduct and discipline provisions have remained substantially the same. (Richmond Aff. ¶ 9.) Butler has not contested this statement.

from being at any gathering where minors are partaking of alcohol or drugs. (*Id.* §§ II(A)(1)—(3).) Finally, the Athletic Code includes an "Honesty Clause," which provides that:

If an Oak Creek–Franklin School District Administrator/Athletic Director has a reasonable suspicion that a specific Oak Creek–Franklin student may have violated the High School Athletic Code, he/she shall question that student about the possible violation. In responding to any such questioning about his/her personal actions, it is expected that the student will answer truthfully. If a student's answer is subsequently found to be untrue, the student will be moved to the next applicable level of discipline because of his/her untruthfulness.

(*Id.* § II(A)(8) at 1.)

The Athletic Code provides that for a first violation of Rules 1—3, a student athlete is suspended from 25% of all scheduled games, meets, or matches. If a violation occurs during the off-season, the student athlete misses 25% of the scheduled games, meets, or matches for the next season of competition. Second and subsequent violations result in suspension for one calendar year. For first and second violations of the alcohol and drug rules only, there is a special provision that reduces the period of suspension if the student participates in a professional assessment at the student's expense. (*Id.* § II(B).) The Athletic Code provides that a student athlete may appeal a disciplinary ruling of the athletic director and coach to the Coaches' Council, which consists of the principal, athletic director, all head coaches, and equipment manager. (*Id.* § II(C)(2).) This provision further provides that the decision of the Coaches' Council is final. (*Id.*)

The Athletic Code includes a detachable section for student athletes and their parents to sign and return to the school. This section requires students and parents to acknowledge, "I have read and understand the Oak Creek High School Athletic Code." (Athletic Code at 2.)

## B. Butler's History Under the Athletic Code

Under Oak Creek's policies and procedures, Butler and one of his parents would have been required to sign this "acknowledgment" for each sport in which Butler participated. (Richmond Aff. ¶ 11.) By Athletic Director Richmond's calculation, Butler and a parent or guardian should have received eleven copies of the Athletic Code from 1997 to the present. (Richmond Aff. ¶ 13.) Richmond asserts that Butler executed acknowledgments each year from 1998 through the present (Richmond Aff. ¶ 14), but in their submissions to the court, defendants have submitted only one acknowledgment, dated August 1, 2000. (Defs.' Ex. 5.) Butler stated in his complaint that neither he nor his parents agreed to "abide by" the Athletic Code. (Compl. ¶ 10(1).)

Over a period of several years, Oak Creek High School has charged Butler with a total of five violations of the Athletic Code. The first occasion was in January 1998, when the head basketball coach, John Tanem, found Butler smoking a cigarette. (Tanem Aff. ¶ 3.) Coach Tanem advised Athletic Director Richmond (*id.* ¶ 4); Richmond called Butler into his office, and, according to Richmond's affidavit, Butler admitted that he had been smoking. In accord with the Athletic Code, Butler was then suspended for 25% of the basketball games for the season. (Richmond Aff. ¶¶ 15–16.)

Butler's second alleged violation stemmed from an April 2000 arrest and citation for possession of marijuana. On April 19, 2000, Athletic Director Richmond called Butler into his office to inquire about the incident. According to Richmond's affidavit, Butler admitted the arrest and citation. (Richmond Aff. ¶¶ 18–19.) As Richmond describes it, Butler said that he was a passenger in a car stopped for erratic driving, and that police found a small amount of marijuana in his coat pocket. About half an hour later, Butler returned to Richmond's office to say that

the coat was not his, but belonged to a friend; Richmond responded that this was irrelevant to the Athletic Code. (*Id.* ¶ 20.) Richmond then issued a one calendar-year suspension dated April 19, 2000. (Defs.' Ex. 8.)

On May 21, 2000, Butler filed a written request to appeal the suspension. (Defs.' Ex. 9.) The appeal was heard by to the Coaches' Council on May 25, 2000. (Defs.' Ex. 10.) Butler told the Coaches' Council that the marijuana was not his but was simply in the pocket of his friend's jacket, which he had borrowed. (Richmond Aff. ¶ 24.) In addition, Butler brought several witnesses who spoke on his behalf. (*Id.*) The Coaches' Council reduced Butler's suspension to 25% of the games in each sport that Butler joined the following calendar year, subject to several conditions, including that he participate in a professional drug assessment at his parents' expense and that he perform one hour of supervised community service. (*Id.*)

The third alleged violation stemmed from Butler's presence at a June 10, 2000 party that later received widespread publicity due to a video-tape made by another student. The Oak Creek Police investigated the party and issued citations to a number of attendees, including Butler. Butler's citation was for unlawful consumption of alcohol by a minor. (Defs.' Ex. 12 (Supp. Report at 1).) Significantly, every single page of the copy of the police report regarding that incident that defendants provided to the court is stamped "Confidential." (*Id.*)

During the week of August 14, 2000 Butler and both his parents met with Athletic Director Richmond and Oak Creek High School Principal Kathy Jorgenson. (Jorgenson Aff. [docket # 12] ¶¶ 9, 11.) At this meeting, Athletic Director Richmond informed Butler that his presence and conduct at the party were his third violation of the Athletic Code and that as a result he was being suspended for one calendar year. (Richmond Aff. ¶ 32.)

Butler appealed the one-year suspension to the Coaches' Council. A hearing was held August 28, 2000, at which Butler was represented by counsel. (Richmond Aff. ¶ 36.) The Coaches' Council reduced the suspension subject to various conditions; subject to Butler's complying with them, he would be allowed to begin playing football on September 29. (*Id.* ¶ 38.)

Three days later, on August 31, 2000, Athletic Director Richmond called Butler into Principal Jorgenson's office to question him about police reports he had received regarding conduct that pre-dated the August 28 Coaches' Council meeting. (Richmond Aff. ¶ 40; Jorgenson Aff. ¶ 12.) Specifically, Richmond told Butler that the school had police reports regarding incidents on July 4 and July 17, 2000 which resulted in his being arrested and issued citations for unlawful possession of intoxicants, unlawful possession of fireworks, and disorderly conduct. (Jorgenson Aff. ¶ 12; Richmond Aff. ¶ 40.)

In the July 4, 2000 incident, it appears that Butler was arrested for possession of alcohol by an underage person, and was issued two municipal ordinance citations, one for the underage possession charge and one for a fireworks offense. (Defs.' Ex. 16.) Once again, every page of the police report that defendants submitted to the court is stamped "Confidential." A court date for the underage possession citation was set for 7 p.m., August 16, 2000 (Defs.' Ex. 17), and it appears that a plea of no contest was entered on that date.

The July 17, 2000 incident appears to have resulted while security guards were removing Butler and an acquaintance from the Southridge Mall in Greendale; as they were being escorted out, Butler allegedly commented loudly to his acquaintance words to the effect of, "Hey, do you still have that gun in the car?" It appears that Butler was then arrested and issued a citation for disorderly conduct. (Defs.' Ex. 18.) This exhibit, a collection of Greendale Police Department reports, has no signatures and appears to have been printed August 28, 2000. Unlike the Oak Creek Police Department reports of the June 10

party and the July 4 incident regarding Butler, it is not stamped "Confidential."

At the August 31 meeting, Richmond advised Butler that the July 4 and July 17 conduct described in the police reports constituted violations of the Athletic Code, each of which required a one-year suspension, and asked if he had anything to say; Butler declined to speak without his mother present. (Jorgenson Aff. ¶ 13; Richmond Aff. ¶ 40.) Richmond then suspended Butler for one calendar year for the Athletic Code violations. (*Id.* ¶ 42; Defs.' Ex. 20.)

Butler submitted a written appeal September 5, 2000. (Defs.' Ex. 21.) A hearing was originally scheduled for September 8, and was rescheduled to September 14 at least in part at Butler's request, to facilitate his witnesses. (Richmond Aff. ¶ 44.) Butler was represented by counsel at the hearing, and presented witnesses who spoke on his behalf. (*Id.* ¶ 45.) The Coaches' Council affirmed the one-year suspension. (*Id.* ¶ 47.)

## II. STANDARD OF REVIEW

The standards to receive such a preliminary injunction are quite high. First, the party seeking the preliminary injunction must show a reasonable likelihood of success on the merits. Second, the party must show that there would be no adequate remedy at law if he or she were forced to wait until the case's ultimate decision. Third, the party must show that he or she would suffer irreparable harm if the requested injunctive relief is denied. *See Graham v. Medical Mut.,* 130 F.3d 293, 295 (7th Cir.1997).

If the petitioner satisfies these first three steps, then, fourth, the court must balance the irreparable harm to the non-moving party if the injunction is granted, against the irreparable harm to the moving party if the injunction is denied. *See Graham,* 130 F.3d at 295. Finally, the court must consider the effect of the injunction on nonparties, that is, its effect on the public interest. *See id.*

## III. ANALYSIS

Oak Creek argues that Butler fails to meet the first three requirements: It asserts that he is unlikely to succeed on the merits, that there would be an adequate legal remedy if he were forced to wait until the end of the case, and finally that he would not suffer irreparable harm if an injunction is denied. I find it necessary to reach only the first of these issues, namely, a likelihood of success on the merits.

### A. Application of the Athletic Code

I first assess Butler's contentions that the school district did not promulgate the Athletic Code and that the high school had no authority to promulgate it; that he did not agree to abide by it; and that the school district did not follow the Athletic Code's procedural requirements in suspending him.

Butler contended during oral argument that under state law, only a school board has authority to suspend a student, and that his suspension from interscholastic athletics by Athletic Director Richmond under the Athletic Code was therefore without lawful authority. (Tr. of 10/10/2000 Arguments [hereinafter "Tr."] at 8, 10–11.) Butler observes that a decision cited by the school district, *Davis v. Central Dauphin School District School Board,* 466 F.Supp. 1259, 1264 (M.D.Pa. 1979), held that a school district superintendent had been without authority under Pennsylvania state law when he suspended a student from a basketball team for the remainder of the season.

Butler's statutory premise proves to be mistaken. The school district administrator, as well as any principal or teacher designated by the administrator, may suspend students for five days (and up to fifteen days in some instances). *See* Wis. Stats. § 120.13(1)(b). To be sure, a student may be expelled only by a school board, or by an independent hearing panel or hearing officer appointed by the school board, *see* § 120.13(c)(3), (e)(3); but these

statutes simply do not govern athletic program participation.

Butler contended at oral argument that despite defendants' claim that the Athletic Code was promulgated by the school board, the only person to submit an affidavit to that effect was Athletic Director Richmond. (Tr. at 25–26; 52.) This is mistaken; as described above, Superintendent Voorhees also stated that the school board enacted the Athletic Code. (Voorhees Aff. ¶ 3.)

In any event, even if the Oak Creek School Board said neither "yea" nor "nay" to the Athletic Code, and the High School simply adopted it on its own, it appears that Oak Creek students would nonetheless be obliged to comply with it. *See* 38 Op. Att. Gen. Wis. 82, 84 (1949) ("If the school board does not adopt rules and regulations which cover the subject matter, there is ample authority sustaining the right of the principal or supervising teacher to do so. Such rules or regulations may be adopted without consent of the pupils.") (citations omitted).

Butler next contends that he never agreed to "abide" by the Athletic Code. (Compl. ¶ 10(b).) The only signed acknowledgment in the record of his "reading" and "understanding" the Athletic Code is dated August 1, 2000. (Defs.' Ex. 5.) Butler might be able to muster an argument that under contract law, a party's signing that he has "read" and "understood" a code of conduct is something different than his promising to abide by the terms of the code of conduct.[4] The Athletic Code states that it applies to all athletes in all seasons. (Athletic Code §§ I(A), (B).) On that basis, continuing Butler's suggested contract law analysis, Oak Creek offered him a unilateral contract: comply with these terms, and we'll consider you for participation on the team. Butler's argument is therefore that he entered the contract without any particular intention to abide by its terms. If this were true, then Butler surely would not be entitled to reinstatement to Oak Creek's teams.

Finally, Butler contended at oral argument that the way in which he was suspended violated two different prongs of the Athletic Code. First, he contended that although the Athletic Code requires suspensions to be made by the Athletic Director and the coach acting together, he was suspended only by Athletic Director Richmond, but—he asserted through counsel—the football coach wants him on the team (Tr. at 54, 55); second, he contended that the Coaches' Council that heard his appeal was deficient because not all members were present; specifically, he asserted through counsel, one coach was absent. (Tr. at 6, 47–48.) Nonetheless, Butler did not raise these arguments in his brief before oral argument; has not put any evidence into the record that the football coach believes that his suspension is unwarranted; has not put any evidence into the record that the full Coaches' Council did not convene to hear his appeal; and has not provided any legal authority to suggest that even if the process he received was substantially less than promised under the Athletic Code, his suspension should therefore be considered invalid as a matter of law. On those bases, it would be premature for me to rule on these contentions.

### B. Entitlement to Due Process

■ The Fourteenth Amendment's Due Process clause provides that "[n]o state shall ... deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. 14 § 1. Thus, whether Butler is entitled to due process in being suspended from the school district's athletics programs depends upon whether he has a liberty or property interest in being allowed to continue to play once he was allowed to begin under the school district's rules.

---

4. As previously noted, Butler does not challenge Richmond's assertions that he should have received eleven copies of the Athletic Code, or that he signed acknowledgments every year from 1998 to the present. (Richmond Aff. ¶¶ 13–14.)

The school district correctly observes that many courts have held that participation in interscholastic athletics is not a constitutionally protected right. *See, e.g., Kulovitz v. Illinois High School Ass'n,* 462 F.Supp. 875, 877 (N.D.Ill.1978) (citing cases). But this is a red herring. In the first instance, contrary to the school district's suggestion here, the question is not whether playing football is a "right" versus a "privilege." *See Morrissey v. Brewer,* 408 U.S. 471, 481, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972).

██ In the second instance, the question is likewise not whether Oak Creek School District is required to provide a football team for Butler to play on, nor whether, given that the school district does provide a football team, Butler has a constitutional right to join it. The liberty and property interests that the Constitution protects are not themselves normally created by the Constitution. *See Goss v. Lopez,* 419 U.S. 565, 572, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975) (citing *Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972)). Thus, whether Butler has a constitutional right to play football is irrelevant to the issues presented here. The question is instead whether, having provided a football team, and having stated that all student athletes who meet the criteria for participation must abide by the Athletic Code, the school district may remove a student from the team on the strength of alleged Athletic Code violations without providing any procedural protections whatsoever. The school district's position is thus that it would be constitutional for it to make an unsupported and unsupportable accusation that a student athlete had violated the Athletic Code, and then to suspend the student from participating in athletics—without ever giving the student a chance to disprove the allegation, or even to deny it. This would obviously be unfair, but that is a different matter than whether it would be constitutional.

### 1. Liberty Interest

██ To determine whether the school district can constitutionally suspend a student athlete without due process, I first determine whether Butler has a recognizable liberty or property interest in being allowed to continue playing interscholastic athletics. I first assess whether there is a liberty interest. It appears that Butler's best argument would be that a liberty interest is implicated because the grounds for his suspension—disorderly conduct and underage possession of alcohol—damage his good name and reputation. In a case where the Chief of Police of Hartford, Wisconsin posted a notice in all retail liquor outlets in Hartford naming a plaintiff as an "excessive drinker" who was not allowed to purchase intoxicating beverages for one year, without notice or a hearing granted to the plaintiff, the Supreme Court ruled that "where a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential." *Wisconsin v. Constantineau,* 400 U.S. 433, 434 n. 2, 437, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971). By contrast, where a university fails to renew a non-tenured professor's one-year contract, there is no suggestion that his good name, reputation, honor, or integrity is at stake. *See Roth,* 408 U.S. at 573, 92 S.Ct. 2701.

However, *Constantineau*'s suggestion that state actors' damaging individuals' reputations is sufficient to create a liberty interest is severely undercut by two later decisions. In *Paul v. Davis,* 424 U.S. 693, 708–09, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976), the Court indicated that *Constantineau* was based not on the plaintiff's reputational injury alone, but on the combination of that injury plus the significant alteration of her status and rights under state law; specifically, her right to purchase alcoholic beverages was also cut off without notice or hearing. Thus, the Court held, defamation, standing alone, is not sufficient to create a liberty interest

protectable under the Fourteenth Amendment. *See Paul*, 424 U.S. at 709, 96 S.Ct. 1155. Likewise, in *Bishop v. Wood*, 426 U.S. 341, 348–49, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976), the Court held that the alleged damage to a police officer's good name and reputation, when he was discharged for alleged failure to follow orders, causing low morale, and conduct unsuited to an officer, were not enough to establish a liberty interest, because these reasons were communicated to him orally and in private. Although it did not resolve the issue, the Seventh Circuit noted in *Schaill by Kross v. Tippecanoe County School Corp.*, 864 F.2d 1309, 1323 (7th Cir.1988), that there is room for doubt whether a student athlete has a constitutionally protected liberty interest in being free of the potential stigma associated with removal from an athletic team. Thus, I am not persuaded at this juncture that Butler is likely to establish that the manner in which he was suspended was sufficient to create a liberty interest due to reputational injury.

### 2. Property Interest

■ I therefore proceed to assess whether there is a property interest. Whether an individual has a protectable property interest under the Fifth[5] or Fourteenth Amendments turns upon whether the person has a "legitimate claim of entitlement," or merely "a unilateral expectation" of being able to continue participating in the government program. *Roth*, 408 U.S. at 577, 92 S.Ct. 2701. Constitutional rights do not exist in a vacuum; their purpose is to protect persons from injuries to particular interests. *See Carey v. Piphus*, 435 U.S. 247, 254, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978). Property interests are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits. *See Roth*, 408 U.S. at 577, 92 S.Ct. 2701.

Thus, the Supreme Court held in *Roth* that where an untenured college professor's one-year contract was not renewed, he had no "entitlement" to a renewal, and therefore did not have a property interest that required due process protections. *See id.* at 578, 92 S.Ct. 2701. However, the Supreme Court ruled in the opposite direction in a separate untenured college professor case decided on the same day, *Perry v. Sindermann*, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972). The difference in *Perry* was that the professor there alleged that his university had a de facto tenure program, and that he had tenure under that program. *See id.* at 600, 92 S.Ct. 2694. On that basis, a person may well have a property interest in continued participation in a government program, even though there is no formal contract guaranteeing that right. *See id.* at 601–02, 92 S.Ct. 2694.

As the Supreme Court has recognized, by choosing to go out for the team, high school athletes voluntarily subject themselves to a degree of regulation even higher than that imposed on students generally. *See Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 657, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995). I thus turn to the relevant regulations to assess whether an Oak Creek student athlete, once allowed to play on an Oak Creek team under the Oak Creek Athletic Code and other pertinent regulations, would have a legitimate expectation of being allowed to continue to play so long as he or she complied with the regulations; or whether instead such a player may be suspended at the "unfettered discretion" of the school district. *Bishop*, 349 U.S. at n. 14. There is an important difference between "losing what one has and not getting what one wants."*Greenholtz v. Inmates of Nebraska*

**5.** The Fifth Amendment is parallel to the Fourteenth Amendment in providing that the federal government shall not deprive individuals of life, liberty, or property without due process of law. The two due process clauses are considered counterparts to one another. *See Paul v. Davis*, 424 U.S. 693, 702 n. 3, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976).

*Penal and Correctional Complex,* 442 U.S. 1, 9, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979).

The applicable rules and regulations here stem from the high school's student/parent handbook; from its Athletic Code; from the WIAA; from the state Attorney General; and from the state legislature. The Seventh Circuit has held that there is no reason to distinguish between a state statute, a municipal ordinance or an administrative regulation and a public school board policy issued pursuant to statutory rule-making authority; each is an "existing rule" that may create a property entitlement under its own force without reference to contract law. *See Hohmeier v. Leyden Community High Schs. Dist. 212,* 954 F.2d 461, 464–65 (7th Cir.1992).

The Oak Creek Philosophy, printed in the Oak Creek High School Student/Parent Handbook, states that Oak Creek High School provides "[v]aried extracurricular activities . . . to help the individual student develop special talents, desirable social traits and behavior patterns, and qualities of leadership." (Defs.' Ex. 4 at 1.) The Activity Program printed in the same handbook states that "[a] comprehensive activity program is conducted at Oak Creek High School. In order to meet the needs of all students, the following activities are made available to the student body. Specific information regarding availability and participation in these programs will be given to the students in the first few weeks of school." (*Id.* at 37.) A boxed notice that precedes Extracurricular Activity Regulations and the Athletic Code states that, "[s]tudents who violate the following rules and regulations will be subject to disciplinary action as outlined." (*Id.*) The Athletic Code lists the offenses which can result in a student athlete's being disciplined (Athletic Code §§ II(A), (B)), and provides an appeal mechanism for student athletes to appeal disciplinary rulings (*id.* § II(C)(2)). My assessment is that Oak Creek High School holds itself out as providing a range of extracurricular activities for its students' benefit, and strongly implies that students who partici-pate in them may continue to do so as long as they comply with the participation rules and regulations that are set out in the Extracurricular Activity Regulations, the Athletic Code, and other pertinent regulations.

This impression is strengthened by the contrast with other school-provided activities that the Oak Creek High School handbook expressly indicates may be withdrawn at the unfettered discretion of school administrators. For example, the Acceptable Use Policy/Technology states that "[t]he use of the Internet and other electronic information resources is a privilege, not a right, and may be cancelled at any time." (*Id.* at 23.) Likewise, the handbook states that "[b]eing able to park your vehicle in the student parking lot is a privilege, not a right," (*id.* at 17), and further provides that "[t]he authorization to drive and park a vehicle on school property is a privilege. The privilege may be withdrawn *at any time* and such a decision is solely the prerogative of school administration." (*Id.* at 18) (emphasis in original). The rules governing interscholastic athletic participation have no such language indicating that continued participation is at the discretion of school administrators.

Oak Creek School District is a voluntary member of the WIAA, and part of Athletic Director Richmond's duties as Athletic Director is to ensure that Oak Creek High School complies with the WIAA's standards. (Richmond Aff. ¶¶ 4–5.) Those standards require member schools to ensure that for certain alleged athletic code violations, the school must provide the student an opportunity to deny the accusation and, if the student does deny the accusation, must provide the student with an opportunity to be heard. (Defs.' Ex. 2 (WIAA Rules of Eligibility, Art. VII § 2(A)(2)) at 39.) Thus, Oak Creek would violate the terms of its membership in the WIAA if it truly did hold the position that the school district suggested at oral arguments, namely, that it can suspend a student athlete based on no more than an

unsupported and unsupportable accusation of violating the Athletic Code.

The Wisconsin Legislature has gone to some effort to accommodate the WIAA's role in providing services to student athletes; in 1979, for example, it modified the state's insurance laws to allow the WIAA to continue providing particular benefits for injuries to or accidental death of student athletes. *See* 1979 Wis. Laws. c. 261 § 8, *reprinted in* Wis. Stat. Ann. ch. 616, subch. I at 374 (West 1995). In 1949, the Wisconsin Senate passed a resolution requesting the Wisconsin Attorney General to provide his official opinion on various topics related to the WIAA and its rules and regulations regarding interscholastic athletics. *See* 38 Op. Att. Gen. Wis. 82–83 (1949) (quoting S. Res. 41 (Wis.1947)). In response, the Attorney General wrote that when school officials consider adopting a code of conduct to govern student athletes—no matter whether under the WIAA or otherwise—"any rule adopted must be reasonable and *must be applied in a reasonable manner." Id.* at 85 (emphasis added). Finally, two different statutes require that discipline under a school's athletic code cannot be baseless. As discussed below, confidential police reports cannot be the "sole basis" for such discipline, indicating that there must be a basis for discipline under an athletic code. Wis. Stats. §§ 118.125(5)(b), 118.127(2). I find that Oak Creek High School, Oak Creek School District, the WIAA, the Wisconsin Attorney General, and the Wisconsin Legislature all recognize that when a school offers the opportunity to participate in high school athletics, it is an important benefit and can be taken away only in a reasonable manner. There must be a basis for a suspension, and the student must be provided an opportunity to deny the accusation.

Considering these sources, I find that there is a reasonable likelihood that Butler will establish that, once he was allowed to participate in Oak Creek High School's athletic programs, he had a legitimate expectation—and thus an entitlement—created by independent state sources, of being allowed to continue participating so long as he adhered to the terms of the Athletic Code and other pertinent rules and regulations.

This conclusion is bolstered by one of the cases cited by the school district, *Davis.* The court there found, based upon similar athletic policies, that:

> Davis had a reasonable expectation under the athletic policies that he would be permitted to participate in high school athletics unless he violated the provisions of the athletic policies. At the very least, then, it is arguable that Davis had a property interest in participating in high school athletics which was created and defined by an independent source, the Central Dauphin School District's Athletic Association Policies.

*Davis,* 466 F.Supp. at 1263–64.

## C. Adequacy of Process

Because I have found that Butler has a reasonable likelihood of establishing a property interest in being allowed to continue participating in interscholastic athletics, the next question is what process is he entitled to. *See Morrissey,* 408 U.S. at 483, 92 S.Ct. 2593.

### 1. Pre–Deprivation Process

■ The procedural safeguards that Butler received before his one-year suspension was imposed on August 31, 2000 were fairly minimal. The safeguard appears to have consisted of no more than Athletic Director Richmond's receiving various police reports, some marked "confidential"; and Butler's having the opportunity to deny that he had in fact violated the Athletic Code, or at any rate, to assert that he had not violated it in a way that required a one-year suspension. As indicated above, Butler declined to speak without his mother's presence.

The question for now is whether this fairly minimal pre-deprivation was adequate, or whether instead Butler was entitled to a hearing and the opportunity to present witnesses before being suspended.

To be sure, Butler was provided a hearing and the opportunity to present witnesses at his appeal to the Coaches' Council on September 14. But because his one-year suspension had already begun by then, though, this constituted a post-deprivation hearing.

The leading case is *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). In that decision, the Supreme Court set out three standards that must be considered to assess when a pre-deprivation hearing is required before a governmental entity may deprive an individual of a protected property interest:

First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews*, 424 U.S. at 335, 96 S.Ct. 893.

### a. Importance of the Interest

■ I now apply the *Mathews* factors. The first factor is the importance of the private interest. In *Goldberg v. Kelly*, 397 U.S. 254, 264, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970), the Supreme Court held that a pre-deprivation hearing is required before a welfare recipient's benefits are cut off, on the ground that an erroneous decision "may deprive an eligible recipient of the very means by which to live while he waits. Since he lacks independent resources, his situation becomes immediately desperate." Similarly, a prisoner who has been released on parole and is accused of a parole violation that would return him to prison is entitled to a pre-deprivation hearing. *See Morrissey v. Brewer*, 408 U.S. 471, 482, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972). Likewise, loss of a driver's license and cutting off utilities, such as water and heat, also require a pre-deprivation hearing. *See Bell v. Burson*, 402 U.S. 535, 539, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971); *Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1, 18, 98 S.Ct. 1554, 56 L.Ed.2d 30 (1978).

The private interest in question here is far from minimal. As Oak Creek High School itself indicates by its voluntary participation in the WIAA, the opportunity to participate in high school extracurricular activities is a valuable part of a complete educational experience. Many students in fact value such participation as much as or more than they value their courses. Nonetheless, I find that the opportunity to play on an athletic team uninterrupted by the possibility of an erroneous suspension is far less weighty than the concerns addressed in *Goldberg*, where an erroneous determination would mean wrongly cutting the very means of life off from a welfare recipient; *Morrissey*, where an erroneous determination would mean that a parolee was wrongly returned to prison; and *Memphis Light, Gas & Water*, where an erroneous decision would mean that a household would wrongly be cut off from water, heat, or power.

### b. Risk of Erroneous Decision Without Full Pre–Deprivation Hearing

■ The second *Mathews* factor is the risk of an erroneous deprivation and the value that might be provided by requiring additional pre-deprivation procedural safeguards. In *Barry v. Barchi*, 443 U.S. 55, 99 S.Ct. 2642, 61 L.Ed.2d 365 (1979), the Supreme Court held that a state could constitutionally suspend a horse trainer's license without a prior evidentiary hearing if one of his horses tested positive for drugs after a race, so long as there was an adequate post-deprivation hearing. Part of the Court's reasoning was that under the state procedures in question, an interim suspension was allowed only after probable cause had been established that the trainer's horse did indeed test positive for drugs, and the horse trainer had the opportunity to present his side of the story; "the State need not postpone a suspension pending an adversary hearing to resolve questions of credibility and conflicts in the

evidence. At the interim suspension stage, [such a process] although untested and not beyond error, would appear sufficiently reliable to satisfy constitutional requirements." *Id.* at 65, 99 S.Ct. 2642.

Butler's own history with the Athletic Code shows that in some instances the additional information from a full-fledged evidentiary hearing does affect the result. On two separate occasions, after hearing evidence from Butler's supporters, the Coaches' Council reduced a suspension that had previously been issued without an evidentiary hearing. But what Butler challenges in this request for a preliminary injunction, though, is the suspension issued without an evidentiary hearing on August 31, 2000. This suspension was supported by police reports indicating that Butler had been arrested and given citations for a total of three alleged municipal ordinance violations committed on July 4 and July 17.[5] Municipal ordinance violations are civil actions and not criminal. *See* Wis. Stat. § 800.02(1); *Village of Bayside v. Bruner*, 33 Wis.2d 533, 535, 148 N.W.2d 5 (1967). A person may be arrested for the violation of a municipal ordinance only if the arresting officer has "reasonable grounds" to believe that the person is violating or has violated the ordinance. Wis. Stat. § 800.02(6). The Wisconsin Supreme Court has held that the "reasonable grounds" needed for an arrest under § 800.02(6) are synonymous with the constitutional standard of probable cause. *See City of Milwaukee v. Nelson*, 149 Wis.2d 434, 454, 439 N.W.2d 562 (1989). Butler's two arrests on suspicion of three ordinance violations thus provided Richmond with a good faith basis to believe that there was probable cause that Butler had, in fact, committed the ordinance violations. Thus there was probable cause for Richmond to believe that Butler had violated the Athletic Code's Rule 1 (prohibiting the possession of alcoholic beverages by student athletes) and Rule 3(c) (prohib-

iting student athletes from violating any criminal laws or local ordinances).

In addition, Richmond provided Butler with the opportunity to explain the police reports. To be sure, Butler declined the opportunity; but the fact that it was extended did provide an additional procedural safeguard against reaching an erroneous decision.

On that basis, I find that Butler's having the opportunity to give his side of the story, in addition to the probable cause supplied by the fact of the arrests, "although untested and not beyond error, would appear sufficiently reliable to satisfy constitutional requirements." *Barry,* 443 U.S. at 65, 99 S.Ct. 2642.

**c. Public Interest and Burden to Government in Providing Pre–Deprivation Hearing**

■ The final element to be weighed in the *Mathews* balancing test is the government's interest, including the administrative burdens that the additional procedural requirement would entail.

In two school discipline cases, the Supreme Court has held that such administrative considerations weigh heavily against providing school students with prior hearings before administering discipline. In *Ingraham v. Wright,* 430 U.S. 651, 682, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977), the Court held that corporal punishment could be administered without a prior hearing. This conclusion was based in part upon the Court's finding that the burden of complying with the procedural requirements, if a hearing had to be held prior to any paddling, no matter how moderate or trivial, might lead school authorities to abandon such discipline altogether, to the detriment of their ability to run an orderly school. *See id.* at 680, 97 S.Ct. 1401.

Likewise, in *Goss v. Lopez,* 419 U.S. 565, 582, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975),

---

**5.** There is no evidence in the record to indicate that either Athletic Director Richmond or Principal Jorgensen was aware when Butler

was suspended that a no contest plea had been entered on August 16 on the citation for underage possession of intoxicant violations.

the Supreme Court held that (except in emergency situations) before even short suspensions from school, students must be told what they are accused of doing and what the basis of the accusation is, and must then be given a chance to explain their version of the facts. However, the Court held that it would overwhelm administrative facilities and would make suspensions too costly a disciplinary tool to be effective if schools were required to offer even truncated trial-type procedures, with an opportunity to secure counsel, confront and cross-examine witnesses, or call witnesses of one's own, before issuing suspensions. *See id.* at 583, 95 S.Ct. 729.

Similarly, in *Barry,* the horse training case, the Court held that:

> [T]he State is entitled to impose an interim suspension, pending a prompt judicial or administrative hearing that would definitely determine the issues, whenever it has satisfactorily established probable cause to believe that a horse has been drugged and that a trainer has been at least negligent in connection with the drugging. In such circumstances, the State's interest in preserving the integrity of the sport and in protecting the public from harm becomes most acute. At the same time, there is substantial assurance that the trainer's interest is not being baselessly compromised.

*Id.* at 64–65, 99 S.Ct. 2642 (citations omitted).

It is true that both Butler and the school district have an interest in making sure that Butler is not subjected to unwarranted suspensions, which means that both have an interest in a full pre-deprivation hearing. *See Goss,* 419 U.S. at 579, 95 S.Ct. 729. Nonetheless, as the Supreme Court has recognized, running an orderly school is a complex undertaking, and "[s]ome modicum of discipline and order is essential if the educational function is to be performed." *Id.* at 580, 95 S.Ct. 729. I find that it would impose very heavy administrative burdens if a hearing were re-quired before any athletic suspension could begin.

Thus, weighing the three *Mathews* factors, I find that Butler has not established a reasonable likelihood of showing that he was entitled to a pre-suspension hearing.

**2. Adequacy of Post–Deprivation Hearing**

At oral argument, Butler contended that the post-deprivation hearing that he received before the Coaches' Council—in the form of what the school district itself calls an "appeal"—was inadequate, on the ground that the hearing simply took for granted that he had violated the Athletic Code, and was concerned only with what punishment to administer. (Tr. at 16.) Nonetheless, there is no evidence in the record to support this claim.

Butler also raises concerns about the fact-finding of the Coaches' Council. Although Butler's being arrested may have provided probable cause to believe that he had committed Athletic Code violations sufficient to justify an interim suspension, a post-deprivation hearing must be based on something more. There is no evidence in the record to suggest that the Coaches' Council relied upon anything more in upholding Butler's suspension than the fact of Butler's arrests. As the Supreme Court has observed, "the mere fact that a man has been arrested has very little, if any, probative value in showing that he has engaged in any misconduct. An arrest shows nothing more than that someone probably suspected the person apprehended of an offense." *Schware v. Board of Bar Exam'rs,* 353 U.S. 232, 241, 77 S.Ct. 752, 1 L.Ed.2d 796 (1957) (footnote omitted). But because this issue was not raised in the briefs and there is no evidence in the record going either direction on this point, it would be inappropriate for me to address it here.

A third factor to consider in determining the adequacy of a post-deprivation hearing is how soon it occurs after the deprivation. In *Barry,* the Supreme Court specifically ruled that due to the severe

consequences of even a temporary suspension, the state must provide a prompt hearing and a prompt decision without appreciable delay following the suspension. *See Barry,* 443 U.S. at 66, 99 S.Ct. 2642. The statute under which the horse-trainer was suspended in that case did not specify how soon a post-suspension hearing had to be held, and moreover allowed up to thirty days for a decision to be issued once such a hearing was held. On that basis, the Court held that the statute violated the Constitution because it did not guarantee a sufficiently prompt post-suspension hearing. *See id.*

In this case, it appears that the Oak Creek High School Athletic Code may be constitutionally deficient because it does not guarantee that student athletes will receive a prompt hearing and prompt decision without appreciable delay following a suspension from athletic participation. Nonetheless, it does not appear that Butler suffered from a delayed hearing or decision. The Coaches' Council appeal from his August 31 suspension was originally scheduled for September 8, and was rescheduled to September 14 at Butler's request, to facilitate his witnesses. The Coaches' Council apparently issued its decision the same day.[6] Thus, it does not appear that Butler can object that his suspension was constitutionally infirm under the Due Process clause due to lack of a sufficiently prompt hearing or decision. *See Barry,* 443 U.S. at 66, 99 S.Ct. 2642.

## D. Reliance on Confidential Juvenile Records

At oral argument, Butler asserted that his juvenile offense reports wrongly made their way into hands of school district authorities, and that because his suspension was based on those records, it was in violation of state law. (Tr. at 16–17.)

Law enforcement officers' records of children and juveniles are, with certain exceptions, required to be kept confidential. *See* Wis. Stat. §§ 48.396(1) (protecting records of children under the Children's Code); § 938.396(1), (1m) (protecting records of juveniles under the Juvenile Justice Code).[7] However, these statutes make specific allowance for the confidential exchange of information between the police and officials of the school attended by the child or juvenile. *See* §§ 48.396(1), 938.396(1), (1m). On that basis, it appears that it was proper for the Oak Creek and Greendale Police Departments to forward police reports about the July 4 and July 17 incidents to the Oak Creek School District. Every single page of the Oak Creek Police reports regarding the July 4, 2000 incident that Athletic Director Richmond relied upon when he suspended Butler is stamped "Confidential." (Defs.' Exs. 12, 16.) This strongly supports an inference that these records were obtained under one of these confidentiality statutes.[8]

---

6. Likewise, following Butler's April 2000 suspension, he requested an appeal on May 21, 2000. The appeal was heard and apparently decided four days later, on May 25, 2000.

7. It appears that Butler is not a "child" or a "juvenile" for these purposes. According to his counsel, Butler's marijuana arrest in April 2000 occurred the night before he turned 18 (Tr. at 16), and the relevant statutes define "child" and "juvenile" as a person less than 18 years of age, "except that for purposes of investigating or prosecuting a person who is alleged to have violated a state or federal criminal law or any civil law or municipal ordinance, 'child' does not include a person who has attained 17 years of age." § 48.02(2); *see also* § 938.02(10m) (same, with "juvenile"

rather than "child"). Thus, it appears that law enforcement officers' records generated in investigating and prosecuting a 17–year-old's alleged municipal ordinance violations are not subject to the confidentiality requirements of §§ 48.396 and 938.396. And police reports about the July 4 and July 17, 2000 incidents, after Butler turned 18, were clearly not subject to these confidentiality requirements.

8. Athletic Director Richmond states in his affidavit simply that "the school had police reports." (Richmond Aff. ¶ 40.) The affidavit is silent as to how and by what purported authority the police records came into Richmond's control. The parties are welcome to submit additional information on this topic in

Moreover, once the school district received the police reports under these statutes, it was *required* to notify Butler. *See* Wis. Stat. § 118.27(1). It thus appears that there was no impropriety in the school district's receiving or speaking to Butler about the police reports.

Nonetheless, state law is explicit that "[l]aw enforcement officers' records *obtained under* §§ 48.396(1) or 938.396(1) or (1m) . . . may not be used as the sole basis for expelling or suspending a pupil *or as the sole basis for taking any other disciplinary action, including action under the school district's athletic code.*" § 118.125(5)(b) (emphasis added). *See also* § 118.127(2) (same, limited to records obtained under § 938.396(1m)). There are two important questions about § 118.125(5)(b)'s application here. First, when a school district suspends, expels, or imposes discipline upon a student based substantially upon confidential police reports obtained under one of the confidentiality statutes, is the student's silence when told of the police reports a sufficient "additional basis" for suspension, expulsion, or discipline? I note in this light that expulsion requires a hearing, *see* §§ 120.13(1)(c)(3), (1)(e)(3), but that the statute does not indicate what inferences, if any, may be drawn from a student's silence.

Second, may a school district expel, suspend, or discipline a student under § 118.125(5)(b) based solely upon police records that it obtained under one of the confidentiality statutes, even though, due to the student's age, the records themselves were not confidential under those statutes? I observe in this light that the Children's Code and the Juvenile Justice Code both provide that they are to be liberally construed to effect their legislative purposes. *See* §§ 48.01(1), 938.01(1). Nonetheless, in the circumstances before me, it appears that the result would have

been the same if Richmond had relied only upon the Greendale Police Department's reports about Butler's July 17, 2000 incident, which apparently were not stamped "Confidential."

A third concern related to confidentiality—although not based upon § 118.125(5)(b)—is whether a school district can preserve the confidentiality of its pupils' records while fulfilling its constitutional obligation to provide notice and a hearing for at least some kinds of sanctions. Once a school district obtains confidential police records about a pupil through one of the confidentiality statutes, it is required to maintain them separately from the pupil's other records, *see* § 118.125(3), and to maintain their confidentiality, *see* §§ 48.396(1), 118.125(2), 118.127(2), 938.396(1), 938.396(1m). As discussed above, certain sanctions against students require notice and a hearing under the Due Process clause, either before or after the sanction is imposed. The Wisconsin Attorney General has stated that:

> In light of this hearing requirement, I seriously question whether school officials can *ever* use "confidential information" received [under § 48.396(1) ] to suspend, expel, or otherwise seriously discipline a student *without disclosing that information to persons not authorized to receive it.*

69 Op. Att. Gen. Wis. 179, 182 (1980) (emphasis added). As relevant here, school districts are allowed to disclose pupil records only to the pupil, *see* § 118.125(2)(a), to the school district's teachers, and to "other school district officials who have been determined by the school board to have legitimate educational interests, including safety interests, in the pupil records." § 118.125(2)(d).[9] The Oak Creek Athletic Code requires that appeals be heard by a Coaches' Council comprised of the principal, athletic director, head coach-

response to the school district's motion for summary judgment.

**9.** Even tighter disclosure requirements are imposed upon confidential police records ob-

tained through § 938.396(1m) than for other pupil records. *See* §§ 118.125(2)(d), 118.127(2).

es, and equipment manager. (Athletic Code § II(C)(2).) There is no evidence before me about whether such persons are all teachers, or have been determined by the school board to have legitimate educational interests in viewing pupils' confidential police records. But even assuming that they are all so covered, it appears—as the Attorney General cautioned—that as a practical matter a school district could not provide a student with a hearing without disclosing confidential police records in violation of the law.

The parties have not addressed these issues, and it would be premature for me to address them at this juncture. Their resolution will thus need to wait until a later stage of this litigation.

### E. Legality of the Athletic Code

#### 1. The "Honesty Clause" and the Fifth Amendment

The Athletic Code's "Honesty Clause" provides that "[i]n responding to any such questioning about his/her personal actions [regarding suspected Athletic Code violations], it is expected that the student will answer truthfully." (Athletic Code § II(A)(8).) Butler challenges the Honesty Clause under the Fifth Amendment, on the ground that in some instances it could affirmatively require students to incriminate themselves in criminal cases. At oral argument, through counsel, Butler asserted that Richmond ordered him under the Honesty Clause to tell him what had happened in his April 2000 disciplinary meeting following his arrest and citation for possession of marijuana. (Tr. at 33.)

The Fifth Amendment provides that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. On that basis, there may well be Fifth Amendment problems if—as Butler's counsel asserted [10]— Athletic Director Richmond or other school officials use the Honesty Clause to order students to incriminate themselves about potentially criminal conduct.

But the preliminary injunction that Butler requests simply seeks to overturn his August 31, 2000 suspension, and does not seek relief for Fifth Amendment violations that allegedly occurred when he was suspended in April 2000. The Honesty Clause does not appear to have been a factor in the August 31 suspension. As discussed above, Richmond gave Butler the opportunity to explain the police reports; Butler declined to do so without his mother's presence. Butler now appears to contend that his being asked at all violated his Fifth Amendment rights. As stated above, municipal ordinance violations are civil actions and not criminal. *See* Wis. Stat. § 800.02(1); *Bruner,* 33 Wis.2d at 535, 148 N.W.2d 5. There is no requirement that a person suspected of violating a municipal ordinance be provided with *Miranda* warnings before being questioned about his or her conduct. *See Village of Menomonee Falls v. Kunz,* 126 Wis.2d 143, 147, 376 N.W.2d 359 (Ct.App.1985). Moreover, it is perfectly permissible for a prosecutor in a municipal ordinance case to call the defendant as an adverse witness. *See Bruner,* 33 Wis.2d at 537, 148 N.W.2d 5. To be sure, if so called, the defendant is free to assert the Fifth Amendment and refuse to take the stand. *See City of Milwaukee v. Burns,* 225 Wis. 296, 299, 274 N.W. 273 (1937). But that is simply to say that Butler was free not to answer Richmond's questions, and Butler has not alleged that any adverse consequences stemmed from his refusal to answer on August 31, 2000. On that basis, the Honesty Clause plays no role in this action, at least at this juncture. Assessing its constitutionality will therefore also have to wait for another day.

#### 2. Legality of the Athletic Code's Extending to Off–Campus, Out-of Season Conduct

Butler contended during oral argument that the Athletic Code's purported

---

**10.** As the school district observed, Richmond's affidavit is the only evidence in the

record regarding what was said at the April 2000 disciplinary meeting. (Tr. at 34–35.)

jurisdiction over student athletes' conduct off campus and out of season—indeed, out of the school year, when the July 4 and July 17 conduct occurred—is jurisdictionally suspect. (Tr. at 14–15.) The school district responded that it is reasonable to require that students follow the athletic code of conduct at all times as a condition of being allowed to participate in interscholastic sports. (Tr. at 31.) The Wisconsin Supreme Court held nearly a century ago that school authorities have the power to suspend students for offenses committed outside school hours and not in the presence of the teacher where necessary to maintain proper discipline in the school and to uphold the authority of the faculty. *See State v. District Bd. of Sch. Dist. No. 1,* 135 Wis. 619, 116 N.W. 232 (1908). I find that Butler has not established a reasonable likelihood of prevailing on this point.

**F. Arguments Under the State Constitution**

 Butler contends in his complaint that his suspension violated his rights under Article I, § 1 and Article X of the Wisconsin Constitution. Article I, § 1 guarantees the inherent right to liberty and the pursuit of happiness; Article X provides for a system of public education. However, Butler has provided no explanation as to how the school district violated these provisions in suspending him. Defendants' brief in support of their motion for summary judgment challenged Butler's assertion that these provisions have anything to do with how student athletes are suspended from participation in interscholastic athletics. (Docket # 11 at 5–6.) Butler did not file a brief in response or address those arguments during the oral arguments. I find that Butler has not established a reasonable likelihood of prevailing on this point.

**IV. CONCLUSION**

Based upon the foregoing analysis, I find that Butler has failed to establish a reasonable likelihood that he will show that his August 31, 2000 suspension was in violation of his rights under the United States or Wisconsin constitutions or statutes. On that basis, **NOW, THEREFORE, IT IS HEREBY ORDERED** that plaintiff Jamaal Butler's Emergency Motion for Preliminary Injunction (docket # 1) is **DENIED**.