**Jamaal BUTLER, Plaintiff,**

v.

**OAK CREEK–FRANKLIN SCHOOL DISTRICT, Oak Creek High School Athletic Department, Mike Richmond and the Oak Creek Coach's Council, Defendants.**

No. 00–C–1298.

United States District Court, E.D. Wisconsin.

Nov. 2, 2001.

Robert E. Sutton of Robert E. Sutton Law Office, Milwaukee, WI, for Plaintiff.

Charles H. Bohl and M. Elizabeth O'Neill of Whyte Hirschboeck Dudek S.C., Milwaukee, WI, for Defendants.

## DECISION AND ORDER

ADELMAN, District Judge.

In September 2000, plaintiff Jamaal Butler filed suit in Milwaukee County Circuit Court, alleging that defendants unconstitutionally suspended him from high school athletics for 12 months following his fourth and fifth violations of the school athletic code. Defendants removed the case to federal court and, after the parties submitted briefs and presented oral arguments, I denied plaintiff's motion for a preliminary injunction. *Butler v. Oak Creek–Franklin Sch. Dist.*, 116 F.Supp.2d 1038 (E.D.Wis. 2000) [*"Butler I"*]. I now address defendants' amended motion for summary judgment.[1]

## I. FACTUAL BACKGROUND

The following factual summary is principally drawn from the decision on the request for a preliminary injunction decision; citations to the record are provided for facts not recited in that decision. Oak Creek High School is a public school which allows its students to participate in athletics subject to the Oak Creek High School Training Code [hereinafter "the Athletic Code"]. As pertinent here, the Athletic Code prohibits student-athletes from consuming or possessing any amount of alcoholic beverages or controlled substances; from violating any criminal law or local ordinance; and from being at any gathering where minors are partaking of alcohol or drugs.

As Oak Creek High School Athletic Director, defendant Mike Richmond has "principal authority over ... decisions to suspend student athletes from school athletics." (Richmond Suppl. Aff. [R. 30] ¶ 2.) After the Athletic Director makes the initial decision to impose discipline, a student may appeal to the Coaches' Council, which consists of the principal, Athletic Director, all head coaches, and equipment manager. The decision of the Coaches' Council is the final decision.

The Athletic Code provides for progressive disciplinary sanctions for successive Athletic Code violations. An initial violation results in suspension from athletics for 25% of a season, and second and subsequent violations result in athletic suspension for one calendar year. Despite the Athletic Code's apparently mandatory language governing discipline, though, the Coaches' Council in practice has the power to, and frequently does, significantly reduce discipline initially imposed by the Athletic Director.

Plaintiff was disciplined for violating the Athletic Code three times before the 12–month suspension that is the subject of the present suit. In January 1998, he was suspended for 25% of the basketball season after being caught smoking. In April 2000, plaintiff received a municipal citation for possession of marijuana and Richmond imposed a 12–month athletic suspension. Plaintiff appealed this suspension to the

---

1. Plaintiff does not object to the portions of the motion regarding his state law claims based upon confidentiality of records and the state constitution. I will therefore grant summary judgment on these claims.

Coaches' Council, and the Coaches' Council reduced the suspension to 25% of the games in each sport that plaintiff participated in the following calendar year, subject to several conditions. On June 10, 2000, plaintiff attended a party at which minors were drinking alcohol. Richmond imposed a 12–month athletic suspension, and plaintiff requested an appeal to the Coaches' Council, which was scheduled to be heard August 28, 2000.

The discipline at issue here was imposed for incidents on July 4 and July 17, 2000. On July 4, 2000, plaintiff was cited by the City of Oak Creek for unlawful possession of intoxicants by a minor and unlawful possession of fireworks. On July 17, 2000, plaintiff received a municipal citation for disorderly conduct in Greendale, a neighboring village. All three ordinances had statutory counterparts, so plaintiff's alleged misconduct would be criminal under the parallel statutes. The arresting officers for these incidents prepared detailed reports describing their first-hand observations of plaintiff's conduct, alleged self-incriminating statements made by plaintiff, and (for the fourth incident) the results of a Portable Breath Test on which plaintiff registered .01 grams of alcohol per 210 liters of breath. (Subst. Exs. in Supp. of Defs.' Br. in Supp. of Summ. J. [R. 21] [hereinafter "Defs.' Ex."], Ex. 16 at 3.) (This result is equal to the margin of error Wisconsin accepts for such tests, and is one-tenth of the 0.10 level that is prohibited for non-underage drivers without prior drunk driving convictions, revocations, or suspensions. Wis. Admin. Code § Trans. 311.10(1)(b) (2001); Wis. Stat. § 340.01(46m)(a).)

On August 28, 2000, the day that the Coaches' Council was scheduled to review plaintiff's suspension for his third incident, a reporter informed Oak Creek School District Superintendent John Voorhees of plaintiff's fourth and fifth incidents. (Sut-

ton Aff. [R. 47] Ex. 9, Voorhees Resp. to Interrog. Nos. 3–4.) Voorhees testified that he attended the August 28, 2000 Coaches' Council meeting, and told its members "that the press had just informed me of the Disorderly Conduct situation in Greendale [the fifth incident] and that was not to be considered as part of the August 28, 2000 hearing." (*Id.* Voorhees Resp. to Interrog. No. 6.) Voorhees apparently did not mention the fourth incident. The Coaches' Council reduced plaintiff's 12–month suspension for the third incident to allow him to begin playing football September 29, 2000, subject to various conditions.

On August 31, 2000, Athletic Director Richmond summoned plaintiff to Principal Kathleen Jorgenson's office to interview him regarding the fourth and fifth incidents. (Richmond knew about these incidents even before Superintendent Voorhees advised the Coaches' Council of the fifth incident on August 28, 2000. (Sutton Aff. Ex. 14, Defs.' Resp. to Pl.'s Req. for Admis. ¶ 7.)) Richmond told plaintiff that the school had police reports describing his conduct on July 4 and July 17, 2000, told him that the conduct set forth in the reports violated the Athletic Code, and asked if plaintiff had anything to say. (Neither Richmond nor Jorgenson makes any claim that Richmond showed plaintiff the police reports or gave him copies.) Plaintiff declined to speak without his mother present. Richmond then suspended plaintiff from athletics for 12 months for his fourth and fifth Athletic Code violations and, after the interview finished, wrote plaintiff's parents that plaintiff had violated the Athletic Code.

On September 5, 2000, plaintiff submitted a written request for an appeal. A Coaches' Council hearing was initially scheduled for September 8, and then rescheduled to September 14, 2000 to accom-

modate plaintiff's witnesses. Sixteen members of the Council attended the hearing, including Richmond; one member, girls' basketball coach Jay Kalski, was absent. (Richmond Suppl. Aff. ¶ 4.) Plaintiff was represented by counsel and presented witnesses who spoke on his behalf. After testimony from plaintiff's witnesses and deliberation, the Coaches' Council affirmed the 12–month athletic suspension. (*Id.* ¶ 6.) The vote was very close: Seven Coaches' Council members voted to modify or overturn plaintiff's 12–month suspension, but nine voted to uphold the suspension. (Defs.' Resp. to Pl.'s Proposed Findings of Fact [hereinafter Defs.' Resp. to Pl.'s PFOF] [R. 49] ¶ 14.)

A court date of August 16, 2000 was set for plaintiff's citations from the fourth incident, but plaintiff did not appear. (R. 24 Exs. A, E.) As a result, no contest pleas were entered on his behalf and default judgments were entered against him on that date. (*Id.*) Defendants make no claim that these dispositions played any role in Richmond's initial decision to suspend plaintiff or the Coaches' Council's final decision to uphold that suspension. On July 18, 2001, a year after plaintiff's fifth incident, the Greendale Municipal Court acquitted plaintiff of committing disorderly conduct on July 17, 2000. (R. 51.)

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is required "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). The mere existence of some factual dispute does not defeat a summary judgment motion; "the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91

L.Ed.2d 202 (1986) (emphasis omitted). For a dispute to be genuine, the evidence must be such that a "reasonable jury could return a verdict for the nonmoving party." *Id.*

Although summary judgment is a useful tool for isolating and terminating factually unsupported claims, *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), courts should act with caution in granting summary judgment, *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505. When the evidence presented shows a dispute over facts that might affect the outcome of the suit under governing law, summary judgment must be denied. *Id.* at 248, 106 S.Ct. 2505.

The moving party bears the initial burden of demonstrating that he is entitled to judgment as a matter of law. *Celotex Corp.,* 477 U.S. at 323, 106 S.Ct. 2548. Where the moving party seeks summary judgment on the ground that there is an absence of evidence to support the nonmoving party's case, the moving party may satisfy its initial burden simply by pointing out the absence of evidence. *Id.* at 325, 106 S.Ct. 2548. Once the moving party's initial burden is met, the non-moving party must "go beyond the pleadings" and designate specific facts to support each element of the cause of action, showing a genuine issue for trial. *Id.* at 322–23, 106 S.Ct. 2548. Neither party may rest on mere allegations or denials in the pleadings, *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505, or upon conclusory statements in affidavits, *Palucki v. Sears, Roebuck & Co.,* 879 F.2d 1568, 1572 (7th Cir.1989). In evaluating a motion for summary judgment, the court must draw all inferences in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

**1110**

### III. DISCUSSION

The Fourteenth Amendment's Due Process Clause provides that "[n]o state shall ... deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV § 1. Plaintiff would have a constitutional right to "due process of law" only if there was a relevant "property interest." *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 571, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). Due process is an issue in this case because defendants voluntarily established an athletic program open to all students so long as they followed the Athletic Code.[2] A governmental benefit, once provided, is a property interest if recipients have a "legitimate claim of entitlement to it." *Id.* at 577, 92 S.Ct. 2701. Property interests arise from "existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Id.*

To assess whether defendants created a property interest in being allowed to continue athletic participation once begun, I examined pertinent documents, rules, regulations, and statutes at length in the preliminary injunction decision. This material included the Oak Creek High School Student/Parent Handbook; the Oak Creek Activity Program; the Athletic Code; the rules of the Wisconsin Interscholastic Athletic Association, or WIAA, of which Oak Creek is a voluntary member; a state attorney general's opinion stating that Wisconsin public schools must apply athletic disciplinary codes reasonably; and two state laws that suggest that there must be a reason before a Wisconsin public school may discipline a student under an athletic code. *Butler I*, 116 F.Supp.2d at 1047–49 (citing 38 Op. Att. Gen. Wis. 82, 85 (1949); Wis. Stats. §§ 118.125(5)(b), 118.127(2) (final sentence)). This detailed analysis led me to find that state law, defendants' voluntary participation in the WIAA, and defendants' Student/Parent Handbook, Activity Program, and Athletic Code, all combined to grant Oak Creek student-athletes security in, and a claim of entitlement to continue, athletic participation. *Id.* at 1049. Accordingly, I found a reasonable likelihood that there was a property interest and determined that plaintiff was reasonably likely to be entitled to due process before a final decision to suspend him from athletics.[3]

Defendants state that they do not concede that there is a property interest

---

2. Plaintiff objects that defendants have not adequately explained how the Athletic Code came into existence (Pl.'s Br. [R. 46] at 3), but he offers no evidence to counter testimony from Superintendent Voorhees and Athletic Director Richmond that the school district adopted the Athletic Code. (Voorhees Aff. [R. 15] ¶ 3; Richmond Aff. [R. 14] ¶ 8). Without evidence to support his position, plaintiff has no basis to complain that the Athletic Code was enacted without lawful authority.

3. This case is thus not about whether there is a constitutional right to play football; no party has made such a claim. Even though "there is clearly no constitutional right to play sports or participate in other school activities," the rules and decisions governing par-

ticipation in high school athletics "must satisfy constitutional principles as applied and may not impinge on due process or equal protection rights. A student has the right to have his or her request to participate in student athletics reviewed under rules that are constitutional." *Ark. Activities Ass'n v. Meyer*, 304 Ark. 718, 805 S.W.2d 58, 61 (1991). "[A] program of interscholastic sports, *after having been provided*, must be administered without violation of the Fourteenth Amendment, at least if the case involves an equal protection claim arising from gender-based discrimination." *Robbins ex rel. Robbins v. Ind. High Sch. Athletic Ass'n*, 941 F.Supp. 786, 791 (S.D.Ind.1996) (internal quotation marks and citation omitted).

(Defs.' Suppl. Br. in Supp. [R. 32] at 2), but nonetheless they do not seek summary judgment based upon any alleged absence of a property interest. Instead, defendants' sole argument for summary judgment is that, assuming there is a property interest, plaintiff received constitutionally adequate procedural protections.

I turn now to this argument. Once it is determined (here, assumed) that due process applies, the question remains what process is due. *Morrissey v. Brewer,* 408 U.S. 471, 481, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972). I address five elements of due process: The right to pre-deprivation procedural protections, the right to adequate notice of the charges, the right to a hearing, the right to an impartial decision-maker, and the right to a decision based on the evidence. *See* Lisa L. Swem, Note, *Due Process Rights in Student Disciplinary Matters,* 14 J.C. & U.L. 359 (1987).

## A. Pre-deprivation Process

■ Some form of hearing must be provided before a final decision deprives an individual of a property interest. *Mathews v. Eldridge,* 424 U.S. 319, 333, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). Whether the final decision must be made before the deprivation starts, or may take place after the deprivation has begun, depends upon the balance of three factors: (1) The weight of the interest at stake, (2) the risk of an erroneous deprivation through the procedures used, and (3) the governmental interest in acting without unnecessary administrative delay. *Id.* at 335, 96 S.Ct. 893. Depending upon the relative weight of these factors, "something less" than a full evidentiary hearing before an adverse governmental action may be sufficient if an adequate post-deprivation hearing is provided. *Id.* at 335, 343, 96 S.Ct. 893; *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 546–47, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985).

■ In the preliminary injunction decision, I assessed whether Athletic Director Richmond's interviewing plaintiff in Principal Jorgenson's office on August 31, 2000 provided adequate pre-deprivation process. As described above, before suspending plaintiff, Richmond told him that the school had received police reports about his fourth and fifth incidents, and asked if he had anything to say. The Supreme Court has held that a tenured public employee may be suspended without pay without a prior hearing, based upon arrest and formal charges, so long as the employee receives a prompt and adequate post-suspension hearing. *Gilbert v. Homar,* 520 U.S. 924, 934, 117 S.Ct. 1807, 138 L.Ed.2d 120 (1997). Likewise, a state could suspend a horse trainer's license based upon probable cause that one of the trainer's horses was given a performance-enhancing drug before a race, although the state was required to provide a prompt post-suspension hearing to verify the drug charge and determine whether the trainer was at fault. *Barry v. Barchi,* 443 U.S. 55, 65, 99 S.Ct. 2642, 61 L.Ed.2d 365 (1979). Although the pre-suspension process here was minimal, plaintiff does not dispute its adequacy, and I will accordingly grant summary judgment on this issue.

## B. Notice

■ Due process requires adequate notice of the charges and the opportunity to be heard. "An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Cent. Hanover Bank & Trust Co.,* 339 U.S. 306, 314, 70 S.Ct. 652, 94 L.Ed. 865 (1950). The timing and content of the notice and the nature of the hearing depend upon the

importance of the interests at stake. *Goss v. Lopez*, 419 U.S. 565, 579, 95 S.Ct. 729, 42 L.Ed.2d 725 (1974).

 In a student discipline case, the notice of charges "need not be drawn with the precision of a criminal indictment." *Jenkins v. La. State Bd. of Educ.*, 506 F.2d 992, 1000 (5th Cir.1975). For an academic suspension of ten days or less, due process requires that the "student be given oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story." *Goss*, 419 U.S. at 581, 95 S.Ct. 729. School officials must provide the student with notice both of the specific charge, that is, the specific rule allegedly violated, and of the specific alleged conduct that is said to violate the rule. *Riggan v. Midland Indep. Sch. Dist.*, 86 F.Supp.2d 647, 658 (W.D.Tex.2000). Thus, the notice "need only be sufficiently specific to advise the student and his counsel of the activities or incidents which have given rise to the proceeding and which will form the basis for the hearing." *Bd. of Educ. of Monticello Cent. Sch. Dist. v. Comm'r of Educ.*, 91 N.Y.2d 133, 139, 667 N.Y.S.2d 671, 690 N.E.2d 480, 483 (N.Y.1997) (internal quotation marks and citation omitted).

> What constitutes "reasonable notice" obviously varies with the circumstances of each case.... While school officials need not particularize every single charge against a student, notice that merely repeats the relevant language of [N.Y.] Education Law § 3214(3)(a) [authorizing suspension of a "pupil who is insubordinate or disorderly or violent or disruptive, or whose conduct otherwise

endangers the safety, morals, health or welfare of others"], or sets forth conclusory assertions that a student violated school rules or disrupted school activities, is not "reasonable" because it fails to provide the student with enough information to prepare an effective defense.

*Id.*

 In the present case, Athletic Director Richmond and Principal Jorgenson both testified that at the August 31, 2000 interview in Jorgenson's office, Richmond told plaintiff that the school had police reports describing his conduct on July 4 and July 17, 2000; that according to the police reports, plaintiff was arrested and cited on suspicion of violating municipal ordinances against possession of alcohol by a minor, unlawful possession of fireworks, and disorderly conduct; and that the conduct described in the police reports violated the Athletic Code. (Richmond Aff. ¶ 40; Jorgenson Aff. ¶¶ 12–13.) There is no evidence that Richmond told plaintiff what his specific alleged misconduct was, that he gave plaintiff a copy of the police reports, or even that he showed him the police reports.

Defendants assert that Richmond's letter to plaintiff's parents, written after the interview, provided plaintiff with "written notice." [4] The letter's first sentence states that, "Your son Jamaal Butler has violated the Oak Creek High School Athletic Training Code." (Defs.' Ex. 20.) This is simply a conclusory assertion, and therefore is not reasonable notice. *Monticello Cent. Sch. Dist.*, 91 N.Y.2d at 139, 667 N.Y.S.2d 671, 690 N.E.2d at 483. The letter's final two

---

4. The letter was stamped, "Confidential: Please Read and Destroy." (Defs.' Ex. 20.) This instruction made the letter the equivalent of an "eyes only" document; without violating the instruction, the recipient could look at the letter but could not keep it, read it more closely on a later date, show it to counsel or others when requesting advice, or refer to or rely upon it during subsequent proceedings. A letter that requests its own destruction serves few of the purposes of written notice, and so cannot be considered "written notice."

lines provide its only other potential "notice": "Fourth Offense: Citation for Possession of Alcohol 8/31/00. Fifth Offense: Citation for Disorderly Conduct 8/31/01." (Defs.' Ex. 20.) These lines give no information about what specifically plaintiff was supposed to have done wrong (although they do suggest that plaintiff was not being disciplined for any fireworks accusations).

Defendants thus advised plaintiff that he was accused of engaging in misconduct on July 4 and 17, 2000, and was being disciplined based upon accusations of disorderly conduct and of possession of alcohol by a minor. In other cases, courts have held the following notices adequate: "on or around January 13th, appellant had 'participate[d] in the preparation and/or distribution and/or dissemination of a newspaper type publication calling for destruction of property and insubordination,' " *Monticello Cent. Sch. Dist.,* 91 N.Y.2d at 139, 667 N.Y.S.2d 671, 690 N.E.2d at 483; "The allegation and basis for the expulsion hearing is your part in the conspiracy to shoot and injure students and staff on November 16, 1998," *Remer v. Burlington Area Sch. Dist.,* 149 F.Supp.2d 665, 667 (E.D.Wis.2001) (Stadtmueller, C.J.), *appeal filed,* No. 01–2654 (7th Cir. June 28, 2001); "I officer B. Fields observed offenders McPherson, Monte D.O.C. # 943559 and offender Steele, Tommy D.O.C. # 93304 kissing and rubbing on each others [buttocks] and holding each others [genitals] while the running of chow," *McPherson v. McBride,* 188 F.3d 784, 784–85 (7th Cir.1999) (alterations in original) (prison discipline case charging inmate with engaging in sexual acts with another). By contrast, the present plaintiff was not given any factual context whatever to the claims of possession of alcohol and of disorderly conduct. A reasonable juror could find that the notice given to plaintiff was the equivalent of simply accusing him of being insubordinate or disorderly or violent or violating school rules or disrupting school activities, none of which is sufficiently specific to provide adequate notice. *Monticello Cent. Sch. Dist.,* 91 N.Y.2d at 139, 667 N.Y.S.2d 671, 690 N.E.2d at 483; *Riggan,* 86 F.Supp.2d at 658 (notice inadequate where it detailed only "the specific charge against [the student] and not the conduct constituting the offense").

Defendants' final argument is that plaintiff must have received adequate notice, because he did not request clarification. (Defs.' Reply Br. at 4.) Some reasonable jurors might accept such an argument, but I do not find that it is so compelling as to require being accepted by all reasonable jurors.

## C. Need for a Hearing

As a rule, some form of hearing must be provided before a final decision is made to deprive someone of a property or liberty interest. *Mathews,* 424 U.S. at 333, 96 S.Ct. 893. However, in certain instances, no hearing is necessary if the person does not deny the allegations on which a proposed deprivation is based. *Codd v. Velger,* 429 U.S. 624, 97 S.Ct. 882, 51 L.Ed.2d 92 (1977) (per curiam); *Wozniak v. Conry,* 236 F.3d 888, 890 (7th Cir.), *cert. denied,* 533 U.S. ——, 121 S.Ct. 2243, 150 L.Ed.2d 231 (2001); *Paige v. Cisneros,* 91 F.3d 40, 44 (7th Cir.1996). The present plaintiff did not deny misconduct when Athletic Director Richmond interviewed him, or at the hearing before the Coaches' Council. Accordingly, defendants might contend that plaintiff was not entitled to his hearing before the Coaches' Council, and that on that basis, any due process violations that occurred there are immaterial.

This contention fails for two reasons. First, the cases lending support to this proposition are easily distinguishable.

*Wozniak* and *Paige* are both property interest cases; Wozniak, a university professor, "trumpeted" his alleged right to "defy" his university's grading rules, and Paige "admitted the factual charges" against him. *Wozniak,* 236 F.3d at 890; *Paige,* 91 F.3d at 44. *Codd* is a liberty interest case; the plaintiff claimed that his employer deprived him of his liberty interest in his good name by putting a report into his personnel file after an apparent suicide attempt. *Codd,* 429 U.S. at 626, 97 S.Ct. 882. But a person's liberty interest in his good name is violated only by false and defamatory information; because the plaintiff did not deny the attempted suicide report, he failed to allege a necessary element of his liberty interest claim. *Id.* at 627–28, 97 S.Ct. 882. Because he failed adequately to allege a liberty interest, the plaintiff in *Codd* had no right to procedural due process, and thus he had no claim for a due process hearing. *Id.* at 628, 97 S.Ct. 882. By contrast, the present plaintiff did not confess to any misconduct, and because he asserts the loss of a property interest, rather than the loss of a liberty interest in his good name, his failure to deny misconduct has nothing to do with his right to a due process hearing.

Second, even if plaintiff had confessed to misconduct, he would still be entitled to a hearing. There are two purposes to a disciplinary hearing: To decide whether a rule violation actually occurred; and, if a rule violation actually did occur, to determine the appropriate punishment. *Codd,* 429 U.S. at 627, 97 S.Ct. 882; *Morrissey,* 408 U.S. at 479–80, 92 S.Ct. 2593. Even if the person being disciplined admits violating a rule, the appropriate punishment must still be determined. *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. at 543, 105 S.Ct. 1487 ("Even where the facts are clear, the appropriateness or necessity of the discharge [of a public employee] may not be."). Thus, even if a school official himself witnessed the conduct forming the

basis for the charge against a student, "the student [must] at least have the opportunity to characterize his conduct and put it in what he deems the proper context" before a final decision is made. *Goss,* 419 U.S. at 584, 95 S.Ct. 729.

Similarly, the Seventh Circuit has held that even if insubordination is conceded, the Constitution may require the opportunity to "inform the decisionmaker's discretion in selecting the appropriate penalty." *Wozniak,* 236 F.3d at 890. "Due process may also contemplate affording the plaintiff an opportunity to be heard on the question of what discipline is warranted by the identified offense. [S]chool authorities were plainly required to give the plaintiff and her parent some opportunity to present a mitigative argument." *Betts v. Bd. of Educ. of Chi.,* 466 F.2d 629, 633 (7th Cir.1972) (citation omitted). In *Wozniak* itself, the court held that the defendant university was not required to hold a hearing before deciding the appropriate punishment for the professor who boasted about defying its rules, not because the professor trumpeted his defiance, but because he was three times invited to submit a written statement or explanation, and a professor could hardly claim to be unfamiliar with the written word. 236 F.3d at 890–91. In short, absent such special circumstances, even someone who boasts of factual guilt must be given a hearing before a final decision is made on the appropriate punishment. Even if the present plaintiff had confessed to committing misconduct, due process would still require a hearing to determine the appropriate discipline.

The need to have a Coaches' Council hearing to determine the appropriate discipline was particularly important on the present facts. The record shows that the Coaches' Council frequently modified disciplinary decisions initially made by Athletic

Director Richmond. Indeed, Richmond had twice before given plaintiff a 12–month athletic suspension, and each time the Coaches' Council determined that a lesser discipline was appropriate. Plaintiff did not admit any misconduct on the present occasion, but even if (like the plaintiff in *Wozniak* ), he had trumpeted his guilt, due process would still require a due process hearing before the Coaches' Council made its final decision to uphold or to modify the discipline that Richmond imposed.

## D. Impartial Decision–Maker

### 1. Impartiality of Coaches' Council

 The final decision to terminate a governmental interest must be made by a neutral and detached decision-maker; those who function in judicial or quasi-judicial capacities must be impartial. *Morrissey*, 408 U.S. at 486, 92 S.Ct. 2593; *Schweiker v. McClure*, 456 U.S. 188, 195, 102 S.Ct. 1665, 72 L.Ed.2d 1 (1982). An official is not necessarily barred from being a decision-maker due to prior involvement in some aspects of a case, *Goldberg v. Kelly*, 397 U.S. 254, 271, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970); absent evidence of particular bias or prejudgment, the same person or entity may first investigate and later adjudicate whether proscribed conduct occurred, *Withrow v. Larkin*, 421 U.S. 35, 53–55, 95 S.Ct. 1456, 43 L.Ed.2d 712 (1975). Thus, school administrators who investigate allegations of misconduct against a student may participate in deliberations about whether the student should be disciplined, so long as they have no pre-existing animus against the student. *Newsome v. Batavia Local Sch. Dist.*, 842 F.2d 920, 927 (6th Cir.1988).

 Nonetheless, it is a "a simple but fundamental tenet of due process [that] 'no man can be a judge in his own case and no man is permitted to try cases where he has an interest in the outcome.' " *Trust & Inv. Advisers, Inc. v. Hogsett*, 43 F.3d 290, 295 (7th Cir.1994) (quoting *In re Murchison*, 349 U.S. 133, 136, 75 S.Ct. 623, 99 L.Ed. 942 (1955)). As a result, the government official charged with recommending a particular decision must not participate in making the actual decision, and the official who makes an initial decision must not participate in making the final decision. "When review of an initial decision is mandated, the decision-maker must be other than the one who made the decision under review." *Withrow*, 421 U.S. at 58 n. 25, 95 S.Ct. 1456.

 As examples, the parole officer who recommends that a parolee be rearrested may not participate in the revocation decision, *Morrissey*, 408 U.S. at 487–88, 92 S.Ct. 2593; officials who make final determinations about whether welfare beneficiaries have lost eligibility for benefits may not have participated in the initial determinations of ineligibility, *Goldberg*, 397 U.S. at 271, 90 S.Ct. 1011; a prisoner's complaint that a letter was wrongly censored must be reviewed by a prison official other than the person who originally disapproved the correspondence, *Procunier v. Martinez*, 416 U.S. 396, 418–19, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974), *overruled on other grounds by Thornburgh v. Abbott*, 490 U.S. 401, 413–14, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989); and a member of the prison disciplinary board that determines whether to reduce a prisoner's good-time credits may not be a witness or participate in a case as an investigating or reviewing officer, *Wolff v. McDonnell*, 418 U.S. 539, 571, 573 n. 20, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). Similarly, the Seventh Circuit recently acknowledged that a prison guard who prepared a report charging an inmate with a disciplinary violation "could not have been given a vote on the [Conduct Adjustment] Board" that decided whether the inmate would lose good-time credits because of the charge. *White v. Ind. Parole Bd.*, 266 F.3d 759, 767 (7th Cir.2001);

*see also Whitford v. Boglino,* 63 F.3d 527, 534 (7th Cir.1995) (per curiam). A school official may not have participated in an incident in such a way as to create "actual bias," *Lamb v. Panhandle Cmty. Unit Sch. Dist. No. 2,* 826 F.2d 526, 530 (7th Cir. 1987), and actual bias is present where a decision-maker makes decisions in several stages of a proceeding, *In re Murchison,* 349 U.S. at 137, 75 S.Ct. 623.

■■■ The Athletic Code not only allows, but requires, the Athletic Director to judge whether a student's alleged misconduct actually occurred and to determine what punishment should be administered. At the August 31, 2000 interview in Principal Jorgenson's office, Athletic Director Richmond told plaintiff that the school had police reports regarding his citations and asked if he had anything to say. The cases above make clear that such an investigative question on its own would not preclude Richmond from participating in the final decision of the Coaches' Council regarding plaintiff's misconduct. (For the same reason, Principal Jorgenson's presence would not preclude her from participating in the Coaches' Council's deliberations and decision.)

However, Richmond did not simply conduct an investigatory interview. He advised plaintiff that the conduct described in the police reports violated the Athletic Code; he suspended plaintiff from athletics; and after the interview, he wrote plaintiff's parents that plaintiff had violated the Athletic Code. (Richmond Aff. ¶¶ 40, 42; Richmond Suppl. Aff. ¶ 2.) Richmond thus found that plaintiff had violated the Athletic Code and disciplined him as punishment for doing so. These adjudicative and decision-making functions far exceed mere investigation.

Nonetheless, in violation of due process's requirement that a decision-maker must be impartial and may not have prejudged a case, the Athletic Code provides that the Athletic Director is a member of the Coaches' Council that makes the final decision concerning the Athletic Director's disciplinary decisions. Assuming that there is a property interest, this procedure is clearly unconstitutional.

In the present case, it is undisputed that Richmond participated in the Coaches' Council meeting on September 14, 2000, that sixteen members were present, and that sixteen votes were cast (Richmond Suppl. Aff. ¶ 4; Defs.' Resp. to Pl.'s PFOF ¶ 14), compelling the conclusion that Richmond cast a vote. In addition, Richmond submitted an affidavit describing what occurred during the Coaches' Council's closed session. (Richmond Suppl. Aff. ¶ 6(f).) Because affidavits in support of summary judgment must be based upon personal knowledge, Fed.R.Civ.P. 56(e), Richmond's affidavit indicates that he was present while the Coaches' Council was deliberating. Defendants plainly violated due process by allowing the Athletic Director to participate in the Coaches' Council that reviewed his own disciplinary decisions.

**2. Possible Requirement to Vacate Decision of Coaches' Council**

■■■ A multi-member panel's decision must be vacated if the deciding vote is cast by a member who is disqualified due to a lack of impartiality. *Aetna Life Ins. Co. v. Lavoie,* 475 U.S. 813, 828, 106 S.Ct. 1580, 89 L.Ed.2d 823 (1986) (8–0). The vote in the present case was very close—9 to 7—but Richmond's vote was not the deciding vote. *Aetna* expressly did not discuss what remedy due process requires when a disqualified person participates but does not cast the decisive vote. *Id.* at 827 n. 4, 106 S.Ct. 1580.

Three of the eight justices in *Aetna* wrote or joined concurrences stating that any decision issued by a multi-member panel must be vacated if a biased member

participated in the decision. *Id.* at 831, 106 S.Ct. 1580 (Brennan, J., concurring) ("while the influence of any single participant in this [deliberative] process can never be measured with precision, experience teaches us that each member's involvement plays a part in shaping the court's ultimate disposition"); *id.* at 833, 106 S.Ct. 1580 (Blackman, J., concurring, joined by Marshall, J.) (because "the collegial decisionmaking process that is the hallmark of multimember courts ... occurs in private, a reviewing court may never discover the actual effect a biased judge had on the outcome of a particular case").

In addition, five of the six circuits to address this question have held that the panel decision must be vacated. "Litigants are entitled to an impartial tribunal whether it consists of one man or twenty and there is no way which we know of whereby the influence of one upon the others can be quantitatively measured." *Berkshire Employees Ass'n of Berkshire Knitting Mills v. N.L.R.B.*, 121 F.2d 235, 239 (3rd Cir.1941). *See also Cinderella Career & Finishing Schs., Inc. v. Fed. Trade Comm'n*, 425 F.2d 583, 592 (D.C.Cir.1970) (vacating and remanding agency decision "despite the fact that former Chairman Dixon's vote was not necessary for a majority"); *Am. Cyanamid Co. v. Fed. Trade Comm'n*, 363 F.2d 757, 767–98 (6th Cir.1966) (agency decision must be vacated and remanded for de novo review; result "is not altered by the fact that [the biased panel member's] vote was not necessary for a majority"); *Antoniu v. Sec. Exch. Comm'n*, 877 F.2d 721, 726 (8th Cir.1989) (vacating commission decision and remanding for de novo reconsideration, even though biased commissioner belatedly recused himself and did not vote on final decision); *Stivers v. Pierce*, 71 F.3d 732, 748 (9th Cir.1995) (vacating unanimous decision because of bias of one panel member; "plaintiff need not demonstrate that the biased member's vote was decisive or that his views influenced those of other members. Whether actual or apparent, bias on the part of a single member of a tribunal taints the proceedings.").

Based upon the reasoning of these decisions, and on the record presently before me, the decision of the Coaches' Council could not be sustained.[5] It is possible, though, that whether vacation is required may be moot. Plaintiff was scheduled to graduate in June 2001, and his 12–month athletic suspension was scheduled to ex-

---

**5.** Among the circuit court decisions to address the question, the only one not to adopt the majority rule is *Bradshaw v. McCotter*, 796 F.2d 100, 101 (5th Cir.1986). One of three judges of a panel of the Texas Court of Criminal Appeals arguably should have recused himself in a criminal defendant's appeal, due to the appearance of bias, but did not do so. With minimal analysis, two judges of the Fifth Circuit denied habeas relief on the ground that "no prejudice has been shown as the result of the conclusion that [the state appellate judge] should have recused himself." *Id.* (The third judge on the Fifth Circuit panel found that the state appellate judge was not required to recuse himself, and therefore did not address the question here. *Id.* at 101–02 (Gee, J., concurring specially).). *See also Baker v. Miller*, 75 F.Supp.2d 919, 926 (N.D.Ind.1999) (similar fact pattern and same result, in part because "[i]t is doubtful whether a [different] panel would have reached a different conclusion"; decision observed that numerous courts had repeatedly rejected the same claims rejected by the state appellate court panel with the judge possibly disqualified due to apparent bias), *appeal dismissed*, No. 99–4335 (7th Cir. Mar 24, 2000) (per curiam).

I observe that the bias in both *Bradshaw* and *Baker* was only apparent. In this case, Richmond might have had actual, rather than merely apparent, bias. Moreover, even if I were persuaded to adopt the view of *Bradshaw* and *Baker,* the closeness of the Coaches' Council's vote, and Richmond's presence during the deliberations, make it seem very possible that Richmond's participation may have changed the outcome.

pire August 31, 2001; the parties have not advised the court about whether these events occurred as scheduled.

### E. Decision Based Upon Evidence

 The final due process element to be addressed here is the requirement that the final decision must rest upon "evidence adduced at the hearing." *Goldberg,* 397 U.S. at 271, 90 S.Ct. 1011. "[T]o give the substance of a hearing, which is for the purpose of making determinations upon evidence, the officer who makes the determinations must consider and appraise the evidence which justifies them." *Morgan v. United States,* 298 U.S. 468, 481–82, 56 S.Ct. 906, 80 L.Ed. 1288 (1936). *See also Bell v. Burson,* 402 U.S. 535, 542, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971) ("It is a proposition which hardly seems to need explication that a hearing which excludes consideration of an element essential to the decision" would violate due process). A school disciplinary hearing need not take the form of a judicial or quasi-judicial trial, and need not observe the rules of evidence, but must nonetheless reach its decision based upon "consideration of the evidence." *Linwood v. Bd. of Educ. of Peoria, Sch. Dist. No. 150,* 463 F.2d 763, 770 (7th Cir.1972).

### 1. Standard of Review

 In *Wood v. Strickland,* 420 U.S. 308, 323, 326, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975), *overruled on other grounds by Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), the Supreme Court upheld a school board's discipline of high school students because it

found that the decision was supported by "evidence." Due to the strength of the evidence in that case—which included the students' confessions to a teacher, to the principal, and to the school board—the Court had no occasion to consider whether due process required a more probing standard of review than "some evidence." In *McDonald v. Board of Trustees of the University of Illinois,* 375 F.Supp. 95, 102–04 (N.D.Ill.), *aff'd,* 503 F.2d 105 (7th Cir.1974) (per curiam), though, the court did consider this question, and concluded that due process required applying only the "some evidence" standard of review, rather than the more demanding "substantial evidence" standard of review, which requires evidence that would be sufficient to persuade a reasonable person, *Universal Camera Corp. v. N.L.R.B.,* 340 U.S. 474, 477, 71 S.Ct. 456, 95 L.Ed. 456 (1951), but is typically imposed as a statutory rather than a constitutional requirement. Courts apply the "some evidence" standard of review as a check upon the procedural fairness of the procedures applied in an administrative setting; unlike the "substantial evidence" standard of review, the "some evidence" standard is not intended as a substantive check on the accuracy of administrative fact-finding. *McDonald,* 375 F.Supp. at 102–03; Gerald L. Neuman, *The Constitutional Requirement of 'Some Evidence',* 25 San Diego L.Rev. 631, 663–64 (1988).

I distinguish this court's standard of review from the standard of proof to be applied by school authorities; standards of review and standards of proof serve different purposes and address different questions.[6] I apply the "some evidence" stan-

---

6. The distinction is not always clearly stated. In *Superintendent v. Hill,* 472 U.S. 445, 455, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985), for example, the Supreme Court used the following language to hold that the "some evidence" standard applies to prison disciplinary hearings: "We hold that the requirements of due process are satisfied if some evidence supports the decision by the prison disciplinary board." As explained by the Vermont Supreme Court,

dard of review to determine whether there was a due process violation; school authorities apply a standard of proof (such as "preponderance of the evidence," "clear and convincing," or "beyond a reasonable doubt") to determine whether a student committed misconduct. Under *Mathews v. Eldridge,* 424 U.S. at 333, 96 S.Ct. 893, the standard of proof that school officials should apply is determined by balancing the weight of the interest at stake, the risk of an erroneous decision under the standard of proof used and the likelihood of a more accurate decision if a more demanding standard is used, and the governmental interest in avoiding the administrative burdens or delays associated with a more demanding standard. At least one federal judge and one commentator have argued that these factors require student disciplinary hearings to use the "clear and convincing" standard of proof. *Smyth v. Lubbers,* 398 F.Supp. 777, 799 (W.D.Mich. 1975); Nicholas Trott Long, *The Standard of Proof in Student Disciplinary Cases,* 12 J.C. & U.L. 71 (1985). I observe here only that no lower a standard of proof than "preponderance of the evidence" could be acceptable. Under this standard, the relevant facts must be determined to be more likely than not. Therefore, by definition, any lesser standard of proof (such as "some evidence" or even "substantial evidence") would allow government officials to make decisions that they themselves believe are more likely than not wrong. Unwarranted discipline is a disservice to the interests of school authorities, as well as the affected student, *Goss,* 419 U.S. at 579, 95 S.Ct. 729 and it is difficult to conceive that *Mathews* would countenance

a school's adopting any standard of proof that would allow school officials to impose discipline even if they themselves believed there was probably no misconduct. *See Brown v. Fauver,* 819 F.2d 395, 399 n. 4 (3d Cir.1987) (holding that if a prison regulation "provides for a burden of proof lower than a preponderance of the evidence, then it follows that an inmate can be punished for acts which he in all probability did not commit. We have grave doubts about the constitutionality of such a regulation.").

▪ The Supreme Court has stated that the "some evidence" standard of review is satisfied if "there was some evidence from which the conclusion of the administrative tribunal could be deduced." *Hill,* 472 U.S. at 455, 105 S.Ct. 2768 (internal quotation marks omitted) (quoting *United States ex rel. Vajtauer v. Comm'r of Immigration,* 273 U.S. 103, 106, 47 S.Ct. 302, 71 L.Ed. 560 (1927)); *see also Thompson v. City of Louisville,* 362 U.S. 199, 199, 80 S.Ct. 624, 4 L.Ed.2d 654 (1960) (stating that the due process question "turns not on the sufficiency of the evidence, but on whether this conviction rests upon any evidence at all"). Despite such sweeping language, the "some evidence" standard of review is not applied literally. As Professor Neuman observes, "Evidence that the respondent was alive at the time in question is usually relevant to any charge against her. The protection of the 'some evidence' requirement demands more than that—less than legal 'sufficiency' of evidence, but more than a trivial charade." Neuman, 25 San Diego L.Rev. at 663. Although "meager" proof will suffice, "the

*Hill* described the appropriate standard for judicial review of the actions of prison authorities, not the proof necessary for a factfinder to find that an inmate violated a disciplinary rule....

. . . . .

... Despite some confusing language in the opinion, it is clear that the Court was not asked to determine the standard of proof the prison disciplinary board was required to meet when imposing discipline. *LaFaso v. Patrissi,* 161 Vt. 46, 633 A.2d 695, 697, 698 (1993).

record [must not be] so devoid of evidence that the findings of the disciplinary board were without support or otherwise arbitrary." *Hill,* 472 U.S. at 457, 105 S.Ct. 2768. "Although 'some evidence' is not much … it still must point to the accused's guilt," and must be sufficiently reliable to support a finding of misconduct. *Lenea v. Lane,* 882 F.2d 1171, 1175 (7th Cir.1989). A decision will fail "some evidence" review if the discrepancy between the findings on which it rests and the evidence of record is so great as to indicate that the findings were not in fact derived impartially from the record. Neuman, 25 San Diego L.Rev. at 678.[7]

### 2. Adequacy of Coaches' Council Procedures

■ The procedures of the Coaches' Council neither provide a mechanism to introduce evidence or charges against a student, nor require any evidence or factual findings before reaching a final decision against a student. Athletic Director Richmond testified:

The procedure followed for a Coaches' Council is as follows:

a. The Coaches' Council is introduced.

b. The student is granted an opportunity to present any information to the Coaches' Council he desires. He can present testimony or witnesses on his behalf, his representative may speak, or he may make a statement on his own behalf.

c. The student and/or representatives may address questions to the members of the Coaches' Council.

d. The members of the Coaches' Council may ask questions of the student and/or representatives.

e. The student and any representatives are excused and the Coaches' Council goes into closed session.

f. The Coaches' Council follows Roberts Rules of Order.

i. If no motion is made to amend the punishment imposed pursuant to the Athletic Code, the punishment will stand and the Coaches' Council is dismissed.

ii. If a motion is made to amend the punishment imposed pursuant to the Athletic Code and the motion is seconded, the Coaches' Council engages in discussion on the matter.

---

7. Prison discipline cases have allowed courts to translate the "some evidence" standard of review into probabilistic terms. In *Hamilton v. O'Leary,* 976 F.2d 341, 346 (7th Cir.1992), homemade weapons were found in a vent outside a four-person cell, and the Seventh Circuit held that, although meager, this was "some evidence" sufficient to discipline one of the inmates whose cell it was. But at the other end of the scale, the two-judge majority in *Hamilton* stated that if any of the 32 prisoners whose cells had access to the vent might have been responsible, they doubted that the resulting 1 in 32 (3.1%) probability of guilt could satisfy due process's requirement of "some evidence" on review. *Id.* at 345. Judge Posner found that the plaintiff argued that the vent could be accessed from the adjoining four-person cell as well as his own, and so "the probability that the plaintiff had possessed one or more of these weapons cannot be reckoned as greater than one in eight, or 12.5 percent. That is not my idea of 'some evidence.'" *Id.* at 347 (Posner, J., dissenting). *See also Harms v. Godinez,* 829 F.Supp. 259, 263–64 (N.D.Ill.1993) (reluctantly applying *Hamilton* to find "some evidence" supported disciplinary findings against each of six inmates (16.7%) after contraband was found in secure area to which all six had access); *Cardenas v. Wigen,* 921 F.Supp. 286 (E.D.Pa.1996) (disciplinary decisions against all 12 inmates (8.3%) who shared a cell in which contraband was found, based solely on that fact, cannot survive "some evidence" review). Thus at least in purely probabilistic cases, 25% is sufficient for "some evidence" review, 16.7% may be enough, 12.5% may not be enough, and 8.3% and 3.1% are too little.

iii. After discussion, the members of the Coaches' Council vote as to whether the punishment imposed pursuant to the Athletic Code should be upheld.

(Richmond Supp. Aff. ¶ 5.) Under these procedures, the Coaches' Council is not told what the student is alleged to have done, which provisions of the Athletic Code the student is alleged to have violated, what evidence there is against the student, or what punishment the Athletic Director imposed. No charges are asserted, and the Athletic Director's findings are not summarized. Nonetheless, the default procedure of the Coaches' Council is to adopt the Athletic Director's decision; there is not even any discussion unless two members make an appropriate motion. These procedures are constitutionally inadequate to satisfy due process's requirement that student discipline be based upon "consideration of the evidence." *Linwood,* 463 F.2d at 770.

### 3. Adequacy of Evidence Before the Coaches' Council

Defendants emphasize that the police reports from plaintiff's fourth and fifth incidents described a portable alcohol test on which plaintiff registered .01 and included officers' detailed descriptions of plaintiff's conduct, as well as alleged self-incriminating statements made by plaintiff. (Defs.' Suppl. Br. at 5–6.) If introduced (and if a copy were provided to plaintiff, absent a need to protect confidential informants), these police reports would have

allowed the decision of the Coaches' Council to satisfy the "some evidence" standard of review.[8] *McPherson v. McBride,* 188 F.3d 784, 786 (7th Cir.1999) (decision based solely upon prison official's one-sentence disciplinary report survived "some evidence" review; disciplinary report was brief but described the alleged infraction in sufficient detail; prisoner was given copy of report in advance of hearing); *Culbert v. Young,* 834 F.2d 624, 631 (7th Cir. 1987) (same; five conduct reports, and inmate given copy of each report prior to hearing); *Hamilton v. Scott,* 762 F.Supp. 794, 800 (N.D.Ill.1991) (same; court expressly relied upon disciplinary committee's summary stating that committee members read the disciplinary report; prisoner given copy of disciplinary report in advance of hearing), *aff'd sub nom. Hamilton v. O'Leary,* 976 F.2d 341, 345 (7th Cir.1992); *Hammock ex rel. Hammock v. Keys,* 93 F.Supp.2d 1222, 1229 (S.D.Ala.2000) (police report showing marijuana residue in student's car sufficient to uphold school's disciplinary decision; although police report was not introduced at disciplinary hearing, court found, and relied upon its finding, that the report was read and considered by both decision-makers; school gave student a copy of police report prior to hearing).

But the police reports in the present case were not before the Coaches' Council (and there is no evidence that defendants or anyone else ever gave a copy of them to plaintiff). Defendants concede that no evi-

---

**8.** It appears that state law would prohibit the Oak Creek police report from being the sole basis for imposing discipline, because it appears that defendants obtained it under statutes that authorize the confidential exchange of information between the police and officials of a child or juvenile's school. Wis. Stats. §§ 48.396(1), 938.396(1), (1m). State law prohibits using police reports "obtained under [these statutes] as the sole basis for taking any other disciplinary action, including

action under the school district's athletic code." *Id.* § 118.125(5)(b); *see also id.* § 118.127(2). I do not accept defendants' argument that because, due to plaintiff's age, they could have obtained a copy of this report as a public record, it does not matter that the copy on which they actually relied was obtained under a confidential information-sharing statute that prohibits such use as the sole basis. But there is no similar problem with the Greendale police report.

dence was introduced at the hearing, either by testimony or documents, concerning any of plaintiff's alleged Athletic Code violations. (Pl.'s PFOF ¶ 12; Defs.' Resp. to Pl.'s PFOF ¶ 12.)[9] Both Principal Jorgenson and Athletic Director Richmond testified that no documents were given to the Coaches' Council at the hearing. (Sutton Aff. Ex. 8, Richmond Resp. to Interrog. No. 7; *id.* Ex. 10, Jorgenson Resp. to Interrog. No. 7). There is no evidence that the police reports were distributed to the Coaches' Council before the hearing, much less that any members read or relied upon them in reaching their decision.[10] The Coaches' Council could not base its decision upon the police reports because they were not introduced.[11]

Defendants identify three other items that might allow the Coaches' Council's decision to survive "some evidence" review: The fact of plaintiff's no contest pleas for the citations from his fourth incident; the Coaches' Council's awareness that plaintiff was arrested and cited for the fifth incident; and plaintiff's failure to deny misconduct. I address these in turn.

### a. No Contest Pleas to Fourth Incident's Citations

 Following plaintiff's non-appearance for the citations stemming from his fourth incident, the Oak Creek Municipal Court entered no contest pleas on his behalf. This fact cannot support the Coaches' Council's decision for at least three

9. In addition to asserting in his PFOF that no evidence was introduced before the Coaches' Council, plaintiff requested an admission under Fed.R.Civ.P. 36(a) that no evidence was submitted at either Coaches' Council hearing. Defendants objected on the patently frivolous ground that the term "evidence" is vague (Sutton Aff. Ex. 14, Defs.' Resp. to Pl.'s Request for Admissions ¶ 2); evidence is defined as "[s]omething (including testimony, documents and tangible objects) that tends to prove or disprove the existence of an alleged fact." *Black's Law Dictionary* 576 (7th ed.1999).

Nonetheless, in the absence of a motion under Rule 36(a), para. 3 to determine the sufficiency of an answer or objection, a frivolous objection cannot be deemed an admission, due to the possibility of unfair surprise. Rule 36(a), 1970 Advisory Committee Note, final para. On this basis, although frivolous, I do not deem defendants' objection an admission.

10. In their briefs, defendants refer to two other documents that they do assert were given to the Coaches' Council, presumably before the hearing. The first is a "notice of hearing provided to the Coaches' Council" that is supposed to have "noted" plaintiff's municipal citations. (Defs.' Resp. to Pl.'s PFOF ¶ 12.) Defendants have not introduced such a "notice of hearing" before this court. The second is Richmond's August 31, 2000

"please read and destroy" letter, stating that plaintiff had violated the Athletic Code and stating the relevant offenses as being cited for disorderly conduct and for possession of alcohol by a minor. Defendants assert in a brief that this letter "was sent to each member of the Coaches['] Council" (Defs.' Reply Br. [R. 50] at 7), although no evidence in the record supports such a claim. The record thus does not support defendants' assertions that any materials were distributed to the Coaches' Council in advance of the hearing, and defendants are silent as to who is supposed to have distributed these documents or when.

But even assuming these documents existed and were distributed, they would only have alerted the Coaches' Council that plaintiff had been cited on suspicion of misconduct; as discussed in section III(E)(3)(b) below, they would not have been evidence of misconduct.

11. Richmond presumably read the police reports before interviewing plaintiff in Jorgenson's office on August 31, 2000, and so, presumably, could have summarized them for the Coaches' Council. However, he testified that he made no statement to the Coaches' Council at the September 14, 2000 hearing. (*Id.*, Ex. 8, Richmond Resp. to Interrog. No. 7.) I express no view on whether a hearsay retelling of a police report would be sufficiently reliable to satisfy the "some evidence" standard under *McPherson* and *Culbert*.

reasons. First, defendants make no claim that the Coaches' Council was aware of, much less relied upon, the no contest pleas in rendering its decision. (Indeed, the only evidence in the record is that the lawyer who then represented plaintiff mistakenly advised the Coaches' Council that plaintiff had *not* been "convicted of" any wrongdoing. (Richmond Aff. ¶ 45.)) Second, under Wisconsin law, "the essential characteristic of the no contest plea[ ] is that it cannot be used collaterally as an admission." *Robinson v. City of W. Allis,* 239 Wis.2d 595, 618, 619 N.W.2d 692 (2000). Thus, even if evidence of the no contest pleas were before the Coaches' Council, those pleas would not have been permissible evidence that plaintiff committed the alleged underlying misconduct. Third, it is quite possible for a school to impose discipline that is justified but nonetheless to do so following procedures that violate due process. *Carey v. Piphus,* 435 U.S. 247, 266–67, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978). On that basis, even if plaintiff's no contest pleas were evidence of misconduct, that would simply mean that there was evidence that could have been introduced before the Coaches' Council to support its decision; it would not cure the Coaches' Council's apparent failure to reach a decision based upon evidence.

### b. Awareness of Fact of Arrest and Citation for Fifth Incident

█ The Coaches' Council may have been aware of the arrest and citation from plaintiff's fifth incident. Superintendent Voorhees told the Coaches' Council at its August 28, 2000 hearing (the one called to address plaintiff's third incident) that "the press had just informed me of the Disorderly Conduct situation in Greendale." (Sutton Aff. Ex. 9, Voorhees Resp. to Interrog. No. 6.) (There is no evidence that the Coaches' Council was aware of plaintiff's arrest or citations for the fourth incident.)

Wisconsin requires municipal citations to include the factual allegations describing the alleged violation, Wis. Stat. Ann. § 66.0113 (West Supp.2001), and as we have seen, a single sentence of allegations can be sufficient for an administrative finding of misconduct, *McPherson,* 188 F.3d at 786. However, the citation for the fifth incident was not before the Coaches' Council (and has also not been submitted to this court); defendants rely solely upon Voorhees's third-hand statement, which I must construe in plaintiff's favor as the non-moving party to include only the bare fact of an arrest and citation.

It violates fundamental fairness and due process to find misconduct based solely upon a mere accusation of misconduct unsupported by factual allegations. Due process requires the party bearing the burden of proof to support its claims with evidence other than bare accusations. The Roman Emperor Julian is reputed to have asked, "If it suffices to accuse, what will become of the innocent?" *Coffin v. United States,* 156 U.S. 432, 455, 15 S.Ct. 394, 39 L.Ed. 481 (1895) (quoting *Rerum Gestarum,* bk. 18, ch. 1). Thus, a defendant's guilt cannot be inferred from his status as a defendant; from the proposition that all defendants are guilty; or from the fact that the defendant was arrested and indicted. *Taylor v. Kentucky,* 436 U.S. 478, 487, 98 S.Ct. 1930, 56 L.Ed.2d 468 (1978). Factfinders may:

consider, in the material for their belief, *nothing but the evidence,* i.e., *no surmises based on the present situation of the accused. . . .*

. . . [T]he combination of the skeletal [jury] instructions, the possible harmful inferences from the references to the indictment, and *the repeated suggestions that petitioner's status as a defendant tended to establish his guilt* created a genuine danger that the jury would convict petitioner on the basis of those *ex-*

*traneous considerations,* rather than on the evidence introduced at trial.

*Id.* at 487–88, 98 S.Ct. 1930 (all emphases other than the first added). In short, due process forbids allowing the mere fact of an arrest and a formal charge of misconduct, standing alone, to be considered as evidence that misconduct actually occurred. To be sure, *Taylor* was a criminal case and addressed the presumption of innocence in criminal trials; but the Court indicated that the caution not to consider the fact of official suspicion in making a factual determination is "particularly needed in criminal cases," and thus also applied in non-criminal matters. *Id.* at 485, 98 S.Ct. 1930 (quoting 9 J. Wigmore, *Evidence,* § 2511 at 407 (3d ed.1940)).

Thus, whether a final decision can survive due process review depends upon whether it is "based on the mere fact of arrest [or also] consideration of events and circumstances leading up to and surrounding an arrest and subsequent indictment." *Webster v. Redmond,* 599 F.2d 793, 802 (7th Cir.1979). The due process difference between an accusation of misconduct and the fact of misconduct is emphasized in *Sieck ex rel. Sieck v. Oak Park–River Forest High School District No. 200,* 807 F.Supp. 73, 76 (N.D.Ill.1992). After being accused of stealing a can of soda, the student in *Sieck* was suspended for ten days, pursuant to what a school administrator conceded was "an unwritten official policy of the school board that a student accused of theft must be suspended." *Id.* The court ruled that it would violate due process to discipline a student based upon an accusation of misconduct without any evidence of actual misconduct; "the hearing procedure would lack the basic due process requirement that it be 'meaningful'." *Id.*

Defendants emphasize that the arrest in the present case was required to rest upon probable cause. Wis. Stat. § 800.02(6) (requiring "reasonable grounds" for arrest on suspicion of violating municipal ordinance); *City of Milwaukee v. Nelson,* 149 Wis.2d 434, 454, 439 N.W.2d 562 (1989) (holding that "reasonable grounds" standard is synonymous with probable cause). I will likewise assume that a citation for violating a municipal ordinance may lawfully be issued only upon probable cause. Assuming that probable cause was present, then the officer who arrested and cited plaintiff believed that plaintiff "probably violated" the ordinance. *State v. Koch,* 175 Wis.2d 684, 701, 499 N.W.2d 152 (1993); *Nelson,* 149 Wis.2d at 460, 439 N.W.2d 562. But the fact of an arrest and citation do not demonstrate that probable cause actually was present; indeed, unless the Coaches' Council knew the factual basis for the arrest and citation, it had no way to know whether the probable cause requirement was actually satisfied. Moreover, neither an arrest nor a formal charge should be admitted as evidence of prior bad acts under Fed.R.Evid. 404(b), because neither "is sufficiently probative of the basic question of whether the defendant committed the underlying crime," 1 Christopher B. Mueller & Laird C. Kirkpatrick, *Federal Evidence* § 109(d) at 616 (2d ed.1994); "the relevance, if any, of [an arrest] lay in the circumstances culminating in the arrest, not the arrest *per se,*" *United States v. McCarthur,* 6 F.3d 1270, 1280 (7th Cir. 1993). But the point here is not the limited probative value of an arrest or a citation unsupported by factual allegations. It is instead that an arrest and formal charge are "extraneous considerations" in determining whether misconduct actually occurred, *Taylor,* 436 U.S. at 488, 98 S.Ct. 1930; it offends due process to consider a bare accusation of misconduct as evidence of its own truth.

This conclusion is buttressed by every decision holding that a finding of misconduct following an accusation did not survive "some evidence" review. The peti-

tioner in *Thompson v. City of Louisville,* 362 U.S. 199, 80 S.Ct. 624, 4 L.Ed.2d 654 (1960), like the present plaintiff, was arrested and charged with disorderly conduct, after being arrested for loitering (he was in a tavern and dancing by himself to a jukebox). Unlike the present plaintiff, who was eventually acquitted of disorderly conduct, Thompson was convicted, in part, his counsel argued, because the police court judge simplified his task "by adopting a 'rule' of accepting the arresting officer's assessment of guilt whenever a defendant had a prior arrest record." Neuman, 25 San Diego L.Rev. at 652–53 & n. 133 (citing Petitioner's Brief at 25–27, *Thompson* (No. 59–59)). The Supreme Court found "no evidence whatever in the record to support these convictions," 362 U.S. at 206, 80 S.Ct. 624, and thereby indicated that a police officer's assessment of guilt, as expressed through the bare facts of arrest and formal charge, is not sufficient legal evidence for a finding of disorderly conduct to survive "some evidence" review.

Thus, even assuming that on September 14, 2000 the Coaches' Council remembered that Superintendent Voorhees had said at the August 28, 2000 hearing that a reporter had said that plaintiff had been arrested and had been given a citation in Greendale, it would violate due process for the Coaches' Council to consider the bare fact of the alleged arrest and citation as evidence of misconduct.

#### c. Reliance upon Plaintiff's Silence

■ Defendants' final argument is that plaintiff did not deny committing misconduct as alleged in the citations, and that they were entitled to draw an adverse inference from his silence. As observed above, the citations alleged violations of municipal ordinances that had statutory counterparts, and so plaintiff's alleged conduct would be criminal activity under the parallel statutes. *City of Cudahy v. De-*

*Luca,* 49 Wis.2d 90, 93, 181 N.W.2d 374 (1970). Defendants' argument thus implicates important Fifth Amendment issues.

■ The Fifth Amendment privilege against self-incrimination may be asserted in any forum, but only if a witness's testimony might subject him or her to criminal prosecution. *Malloy v. Hogan,* 378 U.S. 1, 11, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964). "The privilege can be claimed in any proceeding, be it criminal or civil, administrative or judicial, investigatory or adjudicatory ... it protects any disclosures which the witness may reasonably apprehend could be used in a criminal prosecution or which could lead to other evidence that might be so used." *Murphy v. Waterfront Comm'n,* 378 U.S. 52, 94, 84 S.Ct. 1594, 12 L.Ed.2d 678 (1964), *overruled on other grounds by United States v. Balsys,* 524 U.S. 666, 688, 118 S.Ct. 2218, 141 L.Ed.2d 575 (1998).

The present plaintiff was being prosecuted for municipal ordinance violations (and judgment had already been entered against him for the citations from the fourth incident). Nonetheless, prosecutions for municipal ordinance violations are civil and not criminal in Wisconsin. The constitutional prohibition against double jeopardy applies only to multiple criminal prosecutions for the same conduct; as a result, a defendant may be criminally prosecuted even for conduct previously prosecuted as a municipal ordinance violation. *State v. Kramsvogel,* 124 Wis.2d 101, 120, 369 N.W.2d 145 (1985); *State ex rel. Keefe v. Schmiege,* 251 Wis. 79, 86, 28 N.W.2d 345 (1947). Accordingly, plaintiff's alleged misconduct could result in criminal prosecutions, even though he had been charged with three municipal ordinance violations (and even though judgment had been entered against him on two of them). On that basis, any statement plaintiff made to school authorities regarding his alleged misconduct could be used against him in

later criminal prosecutions. Unless he was granted immunity, plaintiff therefore had the right to assert the Fifth Amendment and to remain silent before school officials.

Nonetheless, plaintiff's entitlement to assert the Fifth Amendment privilege is a separate issue from whether defendants were entitled to draw an adverse inference once he did so. The Supreme Court has repeatedly held that it violates the Fifth Amendment for public officials to discipline a person solely because of his or her refusal to answer questions in a non-criminal setting. *Garrity v. New Jersey,* 385 U.S. 493, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967) (police officers forced to testify or be fired); *Spevack v. Klein,* 385 U.S. 511, 87 S.Ct. 625, 17 L.Ed.2d 574 (1967) (attorney disbarred for asserting the privilege); *Uniformed Sanitation Men Ass'n, Inc. v. Comm'r of Sanitation of N.Y.,* 392 U.S. 280, 88 S.Ct. 1917, 20 L.Ed.2d 1089 (1968) (sanitation workers dismissed for refusing to incriminate themselves); *Gardner v. Broderick,* 392 U.S. 273, 88 S.Ct. 1913, 20 L.Ed.2d 1082 (1968) (police officer required to waive immunity before giving grand jury testimony or be fired); *Lefkowitz v. Turley,* 414 U.S. 70, 94 S.Ct. 316, 38 L.Ed.2d 274 (1973) (architects barred from state contracts for refusing to give grand jury testimony without immunity). In sum, "a State may not impose substantial penalties because a witness elects to exercise his Fifth Amendment right not to give incriminating testimony against himself." *Lefkowitz v. Cunningham,* 431 U.S. 801, 805, 97 S.Ct. 2132, 53 L.Ed.2d 1 (1977).

■ Applying the *Garrity—Lefkowitz* line of cases, the Supreme Court held in *Baxter v. Palmigiano,* 425 U.S. 308, 318, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976), that the Fifth Amendment does allow an adverse inference to be drawn against parties in non-criminal proceedings "when they refuse to testify in response to *probative evidence offered against them* " (emphasis added). *See also Harris v. City of Chicago,* 266 F.3d 750, 752–53 (7th Cir. 2001) (same, quoting *Baxter v. Palmigiano* ). Thus, if a decision-maker has independent evidence that someone has engaged in misconduct, the decision-maker may constitutionally consider the person's silence as additional supporting evidence. In short, where there is other evidence of misconduct, a student's silence may properly become an additional factor pointing towards a guilty finding. *Morale v. Grigel,* 422 F.Supp. 988, 1003 (D.N.H.1976).

■ However, the converse is also true: an adverse decision may not be based solely upon a party's invoking the Fifth Amendment privilege. *Nat'l Acceptance Co. of Am. v. Bathalter,* 705 F.2d 924, 932 (7th Cir.1983). The party bearing the burden of proof must be put to its proof and must support its claims with evidence. *Id.* Although invoking the Fifth Amendment may arouse suspicion, it cannot "by itself establish the disputed fact because the nub is missing, and [t]he nub is legally competent proof. [I]ndependent, probative evidence [must be present] to support an inference drawn when one invokes the protection of the Fifth Amendment." *Harmon v. Mifflin County Sch. Dist.,* 552 Pa. 92, 713 A.2d 620, 624 (1998) (internal quotation marks and citation omitted). In short, "the direct inference of guilt from silence is forbidden." *LaSalle Bank Lake View v. Seguban,* 54 F.3d 387, 390 (7th Cir.1995).[12]

---

12. For a thoughtful discussion and analysis of these issues, see Katharine M. Traylor, Case Note, *Constitutional Law—A Reexamination of the Evidentiary Weight of Adverse Inferences Drawn from an Employee's Invocation of His Fifth Amendment Silence,* 73 Temp. L.Rev. 379 (2000). For discussions of these issues in the school setting, see Robert J. Goodwin, *The Fifth Amendment in Public Schools: A Ratio-*

■ Against this background, the Coaches' Council could draw an adverse inference against plaintiff from his silence only if independent "probative evidence" that plaintiff had actually committed misconduct was before it. *Baxter v. Palmigiano*, 425 U.S. at 318, 96 S.Ct. 1551. As discussed above, the Coaches' Council's only pertinent information (and that from a prior hearing about a different incident) was that plaintiff had been arrested and given a citation on suspicion of misconduct. If an accusation of misconduct were enough to satisfy *Baxter*'s "probative evidence" requirement, then *Baxter*'s rule would never prevent adverse inferences against someone who asserted the Fifth Amendment. In *Baxter* itself, the Court held that a prison disciplinary board could consider a prisoner's silence against him, but only because there was other incriminating evidence beyond the charge itself:

> [A] prison inmate in Rhode Island electing to remain silent during his disciplinary hearing, as respondent Palmigiano did here, is not in consequence of his silence automatically found guilty of the infraction with which he has been charged.... In this respect, this case is very different from the circumstances before the Court in the *Garrity—Lefkowitz* decisions, where refusal to submit to interrogation alone and to waive the Fifth Amendment privilege, standing alone and without regard to the other evidence, resulted in loss of employment or opportunity to contract with the State. There, failure to respond to interrogation was treated as a final admission of guilt. Here, Palmigiano remained silent at the hearing in the face of evidence that incriminated him; and, as far as this record reveals, his silence was given no more evidentiary value

than was warranted by the facts surrounding his case.

*Baxter*, 425 U.S. at 317–18, 96 S.Ct. 1551. Absent evidence in addition to the bare fact of arrest and formal charge, defendants could not draw an adverse inference from plaintiff's silence without violating the Fifth Amendment.

Thus, the items defendants proffer—no contest pleas being entered on plaintiff's behalf for the citations from the fourth incident, the Coaches' Council's awareness of plaintiff's arrest and citation from the fifth incident, and plaintiff's silence in the absence of other evidence of misconduct—are constitutionally inadequate to allow the Coaches' Council's decision to survive review under the "some evidence" standard.

## IV. QUALIFIED IMMUNITY

■ Athletic Director Richmond asserts that he is entitled to qualified immunity. Under this doctrine, "governmental officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Courts employ an objective, two-step analysis: (1) taken in the light most favorable to the party asserting the injury, do the facts alleged set out a constitutional violation, and (2) was the constitutional right clearly established at the time? *Saucier v. Katz*, 533 U.S. 194, 199, 121 S.Ct. 2151, 2156, 150 L.Ed.2d 272 (2001).

■ In the present case I have already found that (assuming there is a

*nale for its Application in Investigations and Disciplinary Proceedings*, 28 Wm. & Mary L.Rev. 683 (1987), and Paul E. Rosenthal, Note, *Speak Now: The Accused Student's*

*Right to Remain Silent in Public University Disciplinary Proceedings*, 97 Colum. L.Rev. 1241 (1997).

property interest) a reasonable jury could find several constitutional due process violations. Thus, the issue is whether the constitutional right in question was so clearly established in August and September 2000 that a reasonable school official would have known he was violating the law. Although the burden of establishing that the constitutional right was clearly established at the relevant time rests upon the plaintiff, *Rakovich v. Wade*, 850 F.2d 1180, 1209 (7th Cir.1988), the present plaintiff has not responded to Richmond's qualified immunity arguments. Plaintiff has thus not satisfied his burden; accordingly, I will grant Richmond's request for qualified immunity.

## V. CONCLUSION

I will set an in-person status conference to discuss what further proceedings may be appropriate. I note that even if plaintiff later establishes that his due process rights were violated, defendants could still attempt to persuade the factfinder that plaintiff suffered no actual injury. To do this, defendants would have to show that the Coaches' Council would have reached the same decision even if due process was complied with. In this event, plaintiff might only be entitled to nominal damages of $1. *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 285–87, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); *Carey v. Piphus*, 435 U.S. 247, 266–67, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978). Whether plaintiff would also be entitled to attorneys fees in this event would depend upon the degree of success that a nominal award represented; "the relevant indicia of success [are] the extent of relief, the significance of the legal issue on which the plaintiff prevailed, and the public purpose served." *Farrar v. Hobby*, 506 U.S. 103, 122, 113 S.Ct. 566, 121 L.Ed.2d 494 (1992) (O'Connor, J., concurring).

NOW, THEREFORE, IT IS HEREBY ORDERED that defendants' amended summary judgment motion (R. 29) is **GRANTED IN PART AND DENIED IN PART.** Plaintiff's pre-deprivation due process claim and state law claims are **DISMISSED;** defendant **MICHAEL RICHMOND** is **DISMISSED AS A DEFENDANT** based upon qualified immunity; and plaintiff's due process claims regarding the final decision are **NOT DISMISSED.**

**IT IS FURTHER ORDERED** that a status conference will be held on *Tuesday, November 13, 2001, at 1:30 p.m.* The conference will take place at the federal courthouse, 517 E. Wisconsin Avenue, Room 204, Milwaukee, Wisconsin.